JESSICA SORENSEN *vs.* PAUL SORENSEN.

Essex. September 18, 1975. — December 29, 1975.

Present: TAURO, C.J., REARDON, BRAUCHER, HENNESSEY, KAPLAN, & WILKINS, JJ.

*Negligence,* Of parent. *Parent and Child. Actionable Tort. Public Policy. Minor. Insurance,* Motor vehicle liability insurance.

In a tort action for negligence arising from an automobile accident brought by an unemancipated minor child against a parent, the doctrine of parental immunity was abrogated in the circumstances of the case to the extent of the parent's automobile liability insurance [351-353]; this court reversed an order allowing the defendant's motion for entry of judgment on the pleadings [367].
Discussion of the doctrine of parental immunity in tort. [353-362]

This court took judicial notice of the widespread existence of automobile liability insurance.  [362-363]

TORT.  Writ in the Superior Court dated December 7, 1972.

A motion for entry of judgment on the pleadings was heard and allowed by *Ponte, J.*

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*Jerry E. Benezra (Thomas E. Cargill, Jr.,* with him) for the plaintiff.

*Walter T. Radulski* for the defendant.

TAURO, C.J.  The plaintiff, an unemancipated minor, brought this action by her mother and next friend, Linda Sorensen, to recover for personal injuries[1] sustained by the plaintiff in a collision between an automobile operated by her father, the defendant Paul Sorensen (the father), and an automobile driven by one Marlene Norton.  The plaintiff's amended declaration contained, inter alia, two counts alleging, respectively, the negligence and gross negligence of the father.  After the filing of an amended answer and the plaintiff's amended replication, the trial judge allowed the defendant's motion for entry of judgment on the pleadings.[2]  This court on its own motion transferred the plaintiff's appeal from the Appeals Court pursuant to G. L. c. 211A, § 10 (A).

This appeal requires us to consider whether an unemancipated minor may recover in an action against a

---

[1] The plaintiff also sought recovery for "conscious suffering" and medical expenses.

[2] At the time of entry of judgment on the pleadings, the Massachusetts Rules of Civil Procedure were not in effect (see Mass. R. Civ. P. 1A, 365 Mass. 731 [1974]) and thus, Mass. R. Civ. P. 12(c), 365 Mass. 754 (1974), did not apply.  Judgment on the pleadings was granted pursuant to G. L. c. 235, § 1 (repealed by St. 1973, c. 1114, § 217, effective July 1, 1974 [St. 1973, c. 1114, § 351]).  *Adiletto* v. *Brockton Cut Sole Corp.,* 322 Mass. 110, 112 (1947).

parent for injuries allegedly caused by the negligence or gross negligence of the parent in the operation of an insured motor vehicle. In *Luster* v. *Luster,* 299 Mass. 480 (1938), and *Oliveria* v. *Oliveria,* 305 Mass. 297 (1940), we held that, in the circumstances of those cases, suits between parent and child for negligence were barred by public policy. The plaintiff asks that we reexamine the principles underlying those holdings "in light of today's 'contemporary conditions and concepts of fairness.'" She argues that such principles no longer support parental immunity in automobile negligence actions and urges that we abrogate the doctrine of parental immunity to the extent necessary to permit her action. She contends further that the undisputed existence of liability insurance coverage in the instant case should justify an exception to the general rule of parental immunity.[3] In this respect, she emphasizes that the respective ad damnums in the counts of the amended declaration relating to the father do not exceed the father's insurance coverage and asserts that, as a result, the insurance company is the true party defendant here.[4] We believe that an absolute parental immunity to actions in negligence is not consistent with contemporary conditions and is no longer required by the necessities of modern family life. Accordingly, we hold that in a tort action for negligence (a) arising from an automobile accident and (b) brought by an unemancipated minor child against a parent, the doctrine of paren-

---

[3] In *Luster* v. *Luster, supra* at 484, we declined to "pass with finality upon" the desirability of such an exception to the rule established therein. The record did not indicate that there was, in fact, adequate insurance in *Luster.* The plaintiff here notes that the issue has not previously been decided by this court.

[4] The plaintiff also argues that the permanence of her serious injuries, which will afflict and disable her during her majority as well as during her minority, provides a ground for distinguishing the *Luster* case and creating an exception to the rule of parental immunity. In view of our disposition of this case, we express no opinion on this argument.

tal immunity is abrogated to the extent of the parent's automobile liability insurance coverage. *Luster* and *Oliveria* are overruled to the extent that they are inconsistent with the result reached here.

The doctrine of parental immunity in tort is apparently a creature of relatively modern American jurisprudence. The early English common law authorities are "meager, conflicting, and obscure." McCurdy, Torts Between Persons in Domestic Relation, 43 Harv. L. Rev. 1030, 1059 (1930). Careful research has disclosed no early decisions involving personal injury actions between parent and child (see *Luster* v. *Luster*, 299 Mass. 480, 482 [1938]; *Gibson* v. *Gibson*, 3 Cal. 3d 914, 916 [1971]; *Badigian* v. *Badigian*, 9 N.Y. 2d 472, 475 [1961] [Fuld, J., dissenting]; W. Prosser, Torts § 122 [4th ed. 1971]). However, the English and American common law has long permitted actions between parent and minor child for matters of contract and property. McCurdy, *supra* at 1057-1058. Comment, Tort Actions Between Members of the Family — Husband & Wife — Parent & Child, 26 Mo. L. Rev. 152, 180 (1961). See *Peterson* v. *City & County of Honolulu*, 51 Hawaii 484, 487 (1969); *Dunlap* v. *Dunlap*, 84 N.H. 352, 353-354 (1930); *Goller* v. *White*, 20 Wis. 2d 402, 410 (1963). Dean Prosser has concluded "that there is no good reason to think that the English law would not permit actions for personal torts as well, subject always to the parent's privilege to enforce reasonable discipline against the child . . ." (footnotes omitted). Prosser, *supra* at § 122. Others have put the matter more positively: "Nothing in the English common law precluded an action by a minor who had been wronged by his parent." *Hastings* v. *Hastings*, 33 N.J. 247, 255 (1960) (Jacobs, J., dissenting). Accord, *Hebel* v. *Hebel*, 435 P. 2d 8, 10 (Alas. 1967); *Badigian* v. *Badigian*, *supra*; 1 F. Harper & F. James, Torts, § 8.11 (1956).

The first American formulation of the doctrine of parental immunity as it is currently known was announced

by the Supreme Court of Mississippi in *Hewlett* v. *George*, 68 Miss. 703, 704 (1891). In *Hewlett*, the plaintiff, a minor, brought an action against her mother for "wilfully, illegally, and maliciously" securing her imprisonment in an insane asylum in order to obtain her property. Without citation to any authority, the court held that, while the relationship of parent to unemancipated minor child persisted,[5] such an action could not be maintained. The court reasoned that "[t]he peace of society, and of the families composing society, and a sound public policy, designed to subserve the repose of families and the best interests of society, forbid to the minor child a right to appear in court in the assertion of a claim to civil redress for personal injuries suffered at the hands of the parent. The state, through its criminal laws, will give the minor child protection from parental violence and wrongdoing, and this is all the child can be heard to demand." *Id.* at 711.[6]

The *Hewlett* decision was followed in most American jurisdictions. Prominent among the early cases were *McKelvey* v. *McKelvey*, 111 Tenn. 388 (1903), and *Roller* v. *Roller*, 37 Wash. 242 (1905). In *McKelvey*, the Su-

---

[5] Although the court in *Hewlett* did not specifically advert to "emancipation," it recognized that a state of facts constituting emancipation might alter the resolution of the case: "The evidence shows that the plaintiff was the minor daughter of the defendant, who had been married, but who, at the time of the alleged injuries, was separated and living away from her husband. Whether she had resumed her former place in her mother's home, and the relationship, with its reciprocal rights and duties, of a minor child to her parents, does not sufficiently appear. If, by her marriage, the relation of parent and child had been finally dissolved, in so far as that relationship imposed the duty upon the parent to protect and care for and control, and the child to aid and comfort and obey, then it may be the child could successfully maintain an action against the parent for personal injuries." 68 Miss. at 711.

[6] In its analysis, the court did not mention that the plaintiff had achieved her majority while the action was pending and did not attempt to distinguish a case of alleged "wilful, intentional" tort from a case involving a negligent tort.

preme Court of Tennessee affirmed dismissal of a suit by a minor child against her father and stepmother for cruel and inhuman treatment. The court relied on *Hewlett*, "the only case which the diligence of counsel has been able to find," (111 Tenn. at 390) and held that "a well-settled rule controlling the relation of father and child" and "sound public policy" supported the decision below. *Id.* at 393. In *Roller*, the Supreme Court of Washington reversed a judgment in favor of an unemancipated minor child who had been raped by her father. The court held that such an action between father and daughter would not lie because of "the interest that society has in preserving harmony in the domestic relations." 37 Wash. at 243. In rejecting the argument of the plaintiff's counsel that harmonious relations had already been disrupted, the court stated: "There seems to be some reason in this argument, but it overlooks the fact that courts, in determining their jurisdiction or want of jurisdiction, rely upon certain uniform principles of law, and, if it be once established that a child has a right to sue a parent for a tort, there is no practical line of demarcation which can be drawn; for the same principle which would allow the action . . . in this case, would allow an action to be brought for any other tort." *Id.* at 244.[7] Many of the early cases which, in partial reliance on these cases, established the rule of parental immunity in other jurisdictions are collected in *Luster* v. *Luster*, 299 Mass. 480, 482, n.* (1938).

This court adopted the rule of parental immunity for negligence actions brought by unemancipated minor children in 1938. In the *Luster* case, a case of first impression in this jurisdiction, we held that an infant plaintiff could not recover damages from his father for injuries sustained when his father, acting in the course of business, "backed his truck upon and over the plaintiff." *Id.* at

---

[7] It is difficult to understand why the child was not permitted recovery in a holding limited to the facts in that case.

481. Although we recognized that "pure logic interposes no obstacle to such an action," we held that, at the time, a "practical" view of "sound public policy" precluded maintenance of the action. *Ibid.* Justice Qua wrote: "Such actions, at least when not collusive, would almost inevitably tend to the destruction of the peace and unity of family life and to the impairment of parental authority and discipline. In the continued intimate contact between parent and child through the long years of the child's minority many occasions must arise out of which claims, real or specious, could be made that the parent had been negligent in some matter of commission or omission to the injury of the child. During the minority of the child such claims, even if valid, commonly could be investigated and prosecuted only through the intervention of outsiders whose intrusions, not always disinterested, into the intimacies of family life would seek excuse and justification on the ground that perhaps a cause of action might be unearthed for the benefit of the child. . . . We are unable to accept the theory that the family as the ultimate social unit is so far moribund that these considerations have ceased to have vitality." *Id.* at 481-482.

The court's view of the sound public policy was buttressed by the "overwhelming weight of authority" in favor of parental immunity which had "built up in this country." *Id.* at 482. It was noted in the opinion that criticism of the majority rule was restricted to the works of some commentators and text writers, several vigorous dissents in leading cases, and the majority opinion in *Dunlap* v. *Dunlap*, 84 N.H. 352 (1930), a case which distinguished cases supporting the majority rule. However, the court "confined [the decision] to the case presented" and did not explore the ramifications of the policy of the cases in the areas of property rights or intentional conduct. *Luster* v. *Luster, supra* at 484.

In *Oliveria* v. *Oliveria*, 305 Mass. 297, 299 (1940), we held that the principles embraced in *Luster* barred an

action by a mother against her son for personal injuries allegedly suffered as a result of his gross negligence. Justice Qua, again writing for the court, stressed "the fundamental objection that it is contrary to the best interests of society that the innumerable intimate contacts between parent and child in the life of the family should become the subject of actions for negligence . . . ." *Id.* at 299. As in *Luster,* "[t]he great weight of existing authority" was in accord with this court's decision. *Ibid.*

In the years since *Luster* and *Oliveria,* we have not been required to reconsider their holdings. In the intervening years, a marked trend toward abrogation or limitation of the doctrine of parental immunity has developed in other jurisdictions. While the majority of jurisdictions still retain significant vestiges of the parental immunity doctrine, many jurisdictions have elected to renounce the doctrine in whole or in part after review of the public policy underlying the doctrine. *Hebel* v. *Hebel,* 435 P.2d 8 (Alas. 1967). *Streenz* v. *Streenz,* 106 Ariz. 86 (1970). *Gibson* v. *Gibson,* 3 Cal. 3d 914 (1971). *Petersen* v. *City & County of Honolulu,* 51 Hawaii 484 (1969). *Rigdon* v. *Rigdon,* 465 S.W.2d 921 (Ky. 1971). *Plumley* v. *Klein,* 388 Mich. 1 (1972). *Silesky* v. *Kelman,* 281 Minn. 431 (1968). *Rupert* v. *Stienne,* 90 Nev. 397 (1974). *Briere* v. *Briere,* 107 N.H. 432 (1966). *France* v. *A.P.A. Transp. Corp.,* 56 N.J. 500 (1970). *Gelbman* v. *Gelbman,* 23 N.Y.2d 434 (1969). *Nuelle* v. *Wells,* 154 N.W.2d 364 (N.D. 1967). *Falco* v. *Pados,* 444 Pa. 372 (1971). *Smith* v. *Kauffman,* 212 Va. 181 (1971). *Goller* v. *White,* 20 Wis. 2d 402 (1963).[8] Compare *Schenk* v. *Schenk,* 100 Ill. App. 2d 199 (1968), with

---

[8] In *Felderhoff* v. *Felderhoff,* 473 S.W.2d 928, 933 (Tex. 1971), the Supreme Court of Texas held that the parental immunity doctrine would not bar an action based on negligence "in the conduct of business activities wholly outside of the sphere of parental duties and responsibilities." While the court declined to abrogate the doctrine completely and carefully limited its holding to the facts of the case, the court also indicated that it believed "a better course was followed

*Kobylanski* v. *Chicago Bd. of Educ.*, 22 Ill. App. 3d 551 (1974). The cited case law indicates that all the jurisdictions which have chosen total or qualified abrogation of the doctrine would entertain an action by an unemancipated minor child against a parent for negligent operation of an automobile — the fact pattern in the instant case. Indeed, with the exception of the *Petersen* and *Kobylanski* cases, all the above cited cases involve motor vehicles.[9]

In many jurisdictions which have not abrogated parental immunity, the courts have nevertheless fashioned exceptions and qualifications to the parental immunity doctrine. Some such exceptions have foreshadowed recent abrogations of the doctrine; all such exceptions are indicative of "growing judicial distaste for a rule of law which in one sweep disqualified an entire class of injured minors." *Gibson* v. *Gibson*, 3 Cal. 3d 914, 918 (1971). Cf. *Mounsey* v. *Ellard*, 363 Mass. 693, 701 (1973). Courts have permitted actions against a parent for injuries caused by the parent's wilful, wanton, or intentional misconduct.[10] (*Emery* v. *Emery*, 45 Cal. 2d 421 [1955]; *Horton* v. *Reaves*, 186 Colo. 149 [1974]; *Nudd* v. *Matsoukas*, 7 Ill. 2d 608 [1956]; *Mahnke* v. *Moore*, 197 Md. 61 [1950]; *Cowgill* v. *Boock*, 189 Ore. 282 [1950]), and for injuries inflicted by the parent in the

---

by the Supreme Courts of Kentucky, Minnesota and Wisconsin . . . ." These courts are among those which have accepted qualified abrogation of the rule. See *Rigdon* v. *Ridgon, supra*; *Silesky* v. *Kelman, supra*; *Goller* v. *White, supra*.

[9] In *Goller*, the father drove a tractor.

[10] *Hewlett, Roller* and *McKelvey*, the early trilogy of cases which first propounded the parental immunity rule, would likely now fall within the exceptions to the rule in most jurisdictions. The *Roller* holding was disapproved in *Borst* v. *Borst*, 41 Wash. 2d 642, 657 (1952). See *Dunlap* v. *Dunlap*, 84 N.H. 352, 361 (1930): "The father, who brutally assaults his son or outrages his daughter, ought not to be heard to plead his parenthood and the peace of the home as answers to an action seeking compensation for the wrong."

performance of duties related to his business or vocation (*Trevarton* v. *Trevarton,* 151 Colo. 418 [1963]; *Dunlap* v. *Dunlap,* 84 N.H. 352 [1930]; *Signs* v. *Signs,* 156 Ohio St. 566 [1952]; *Worrell* v. *Worrell,* 174 Va. 11 [1939]; *Borst* v. *Borst,* 41 Wash. 2d 642 [1952]; *Lusk* v. *Lusk,* 113 W.Va. 17 [1932]).[11]  Courts have held that parental immunity will not bar actions against the estate of a deceased parent (*Brennecke* v. *Kilpatrick,* 336 S.W.2d 68 [Mo. 1960]; *Dean* v. *Smith,* 106 N.H. 314 [1965]) or actions between an emancipated minor and his parent (*Martinez* v. *Southern Pac. Co.,* 45 Cal. 2d 244, 253-254 [1955]; *Logan* v. *Reaves,* 209 Tenn. 631, 637 [1962] [wrongful death action for parent's estate against child]). This court has held that an action will lie against the parent's employer under respondeat superior for the tort of the parent within the scope of his employment (*O'Connor* v. *Benson Coal Co.,* 301 Mass. 145, 147 [1938]), and that the family relationship cannot justify exceptions to liability under our wrongful death statute (*Oliveria* v. *Oliveria,* 305 Mass. 297, 300-303 [1940]).

We believe that the authorities which favor abrogation of the parental immunity doctrine state the proper approach in light of modern conditions and conceptions of public policy.  Children enjoy the same right to protection and to legal redress for wrongs done them as others enjoy.  Only the strongest reasons, grounded in public policy, can justify limitation or abolition of those rights.  *Petersen* v. *City & County of Honolulu,* 51 Hawaii 484, 487 (1969).  *Dunlap* v. *Dunlap, supra* at 361.  We cannot agree with the view expressed in the *Luster* case that a scrupulous regard for the integrity, harmony and continuity of the family necessitates denial of tort recovery to a child injured in an automobile acci-

---

[11]Compare *Luster* v. *Luster,* 299 Mass. 480 (1938), in which the parent injured his child while driving a truck in the course of his business.  We declined to distinguish the case from one "connected with the father's duty to rear his child." *Id.* at 483.

dent.  To hold that minors' "pains must be endured for
the peace and welfare of the family is something of a
mockery."  *Badigian* v. *Badigian,* 9 N.Y.2d 472, 482
(1961) (Fuld, J., dissenting).[12]  In dealing with an auto-
mobile accident in which two passengers, one an
unemancipated minor child of the defendant driver and
the other a minor who had no familial relationship to the
defendant driver, are injured, it would be incongruous to
permit recovery against a parent and the parent's
insurance company by the unrelated child but to deny
recovery to the parent's child when culpability is
admitted or established.  See *Immer* v. *Risko,* 56 N.J.
482, 495 (1970).

The argument that parental immunity is necessary to
preserve the tranquility and harmony of domestic life
misconceives the facts of domestic life.  The primary dis-
ruption to harmonious filial relations is not the lawsuit
brought for damages after the injury but the injury itself,
resulting from the misconduct of a parent.  *Falco* v.
*Pados,* 444 Pa. 372, 380 (1971).  When the wrong has
been committed, the harm to the basic fabric of the
family has already been done and the source of rancor
and discord already introduced into family relations.
*Tamashiro* v. *De Gama,* 51 Hawaii 74, 78 (1969).  *Balts*
v. *Balts,* 273 Minn. 419, 429 (1966).  It can hardly aid
family reconciliation to deny the injured child access to
the courts and, through them, to any liability insurance
which the family might maintain.

Abrogation of the parental immunity doctrine in cases
such as the instant one is not likely to encourage
numerous investigative intrusions by outsiders into the

---

[12] We limit our discussion of public policy to those considerations
raised in our previous cases concerning the parental immunity doctrine
and to those considerations raised in the defendant's brief.  For dis-
cussion of a variety of other arguments sometimes deemed supportive
of parental immunity, see, e.g., *Balts* v. *Balts,* 273 Minn. 419 (1966);
McCurdy, Torts Between Persons in Domestic Relation, 43 Harv. L.
Rev. 1030, 1072 et seq. (1930).

family privacy or to turn the family into a legal battle-ground. People living together in conditions of mutual love and respect are not likely to initiate suit against one another. *Balts* v. *Balts, supra* at 430. "There is something finer and deeper than artificial [legal] compulsions that makes the family relationship as strong and causes it to be as zealously maintained [by some] as in the ancient age." *Rozell* v. *Rozell,* 281 N.Y. 106, 111-112 (1939). When an action is brought against a parent, frequently it will be brought at the instance of, or with the approval of, the parent[13] with an eye toward recovery from the parent's already purchased liability insurance.[14] When there is no insurance coverage it is unlikely that suit will be brought against the parent.

In rare cases where the action is a true adversary one against a parent who refuses to contribute sufficiently to the support of a child and to the cure of the child's injuries, judicial formulation of an obstacle to the suit cannot contribute to family harmony or restore the proper relations among the members. Judge Fuld has described the situation and the necessary legal result: ". . . Those parents who are worthy of affection will make provision for the crippled child to the extent of their ability without the spur of legal process. The child will be unwilling to sue, will have no need or thought to sue. What is right will be done, and it will be done out of a love that is stronger than the law. There may be some parents who are selfish or indifferent or cruel; if they turn the crippled child adrift when his minority is over, he will be a drag upon society and a burden to

---

[13] Often the parent will initiate the action for the child. Compare, however, *Luster* v. *Luster,* 299 Mass. 480, 482 (1938), in which a second cousin who had been appointed guardian of the child brought the action, and *Small* v. *Rockfeld,* 66 N.J. 231 (1947), a wrongful death action brought by a grandmother, as administratrix of her daughter's estate, for the murder of her daughter.

[14] See n.15.

himself. We should say that they may not do so with impunity. There are other parents who, though willing, may be helpless. We should hold that the child is not to be denied the benefit of insurance that would be available for a stranger." *Badigian* v. *Badigian*, 9 N.Y.2d 472, 478 (1961) (Fuld, J., dissenting).

A negligence action with parent and child as true adversaries will not generate any more acrimony or disharmony than would a contract action or action for property, undertaken in similar adversary circumstances and, as noted, long permitted at common law. See *Streenz* v. *Streenz*, 106 Ariz. 86, 88 (1970); *Briere* v. *Briere*, 107 N.H. 432, 435-436 (1966); *Goller* v. *White*, 20 Wis. 2d 402, 410 (1963). Cf. *Immer* v. *Risko*, 56 N.J. 482, 488-489 (1970).

Finally, in considering the effect of actions such as this one on family life, we take judicial notice of the widespread existence of automobile liability insurance. Although insurance cannot create liability where no legal duty previously existed (*Luster* v. *Luster*, 299 Mass. 480, 483 [1938]; *Gibson* v. *Gibson*, 3 Cal. 3d 914, 922 [1971]), it remains, nevertheless, a proper element in a discussion of the public policy supporting abrogation of parental immunity. "Where such insurance exists, the domestic tranquility argument is hollow, for in reality the sought after litigation is not between child and parent but between child and parent's insurance carrier." *Streenz* v. *Streenz*, 106 Ariz. 86, 88 (1970). When insurance is involved, the action between parent and child is not truly adversary; both parties seek recovery from the insurance carrier to create a fund for the child's medical care and support without depleting the family's other assets.[15] Far from being a potential source of

---

[15]In case of a settlement or award, it would be most appropriate that a guardian ad litem be appointed to protect and maintain the proceeds of the settlement or award for the benefit of the injured child.

disharmony, the action is more likely to preserve the family unit in pursuit of a common goal — the easing of family financial difficulties stemming from the child's injuries.[16] See *Gibson* v. *Gibson, supra* at 922; *Tamashiro* v. *DeGama,* 51 Hawaii 74, 78 (1969); *Gelbman* v. *Gelbman,* 23 N.Y.2d 434, 438 (1969); *Goller* v. *White, supra* at 412. It is difficult to rationalize the defendant's argument here that payment into the family coffers would disrupt the tranquility of the family.

A more practical problem in this context is that of possible collusion between parent and child which aims at securing an unjustified recovery from an insurance company. It is argued that when the proceeding ceases to be a truly adversary one, "it becomes peculiarly liable to abuse through collusion." *Luster* v. *Luster,* 299 Mass. 480, 483 (1938). But the possibility of collusion exists to a degree in any case.[17] We constantly depend on efficient investigations and on juries and trial judges to sift evidence in order to determine the facts and arrive at proper verdicts. As part of the factfinding process, these triers of fact must "distinguish the frivolous from the substantial and the fraudulent from the meritorious." *Falco* v. *Pados,* 444 Pa. 372, 381 (1971). Experience[18]

---

[16]In *Oliveria* v. *Oliveria,* 305 Mass. 297, 299 (1940), we observed, "Such an action as this was unknown here until the recent extension of liability insurance held out the hope that occurrences within the home circle might become a source of net profit to the family." But this observation was not entirely accurate. Absent any collusive action as to liability or injury, the injured child seeks only to recover that which is permitted to all others in similar circumstances.

[17]In *Emery* v. *Emery,* 45 Cal. 2d 421, 431-432 (1955), and *Rozell* v. *Rozell,* 281 N.Y. 106, 113 (1939), the California and New York courts rejected the collusion argument as a ground for barring recovery in suits between minor siblings.

[18]The experience in New Jersey with actions between host and guest after an automobile accident is consistent with our own experience with actions having the potential for collusion: While "[t]here have undoubtedly been some fraudulent claims asserted . . .

has shown that the courts are quite adequate for the task. See *Tamashiro* v. *DeGama, supra* at 78; *Rupert* v. *Stienne,* 90 Nev. 397, 400-401 (1974); *Briere* v. *Briere,* 107 N.H. 432, 434-435 (1966). Cf. *George* v. *Jordan Marsh Co.,* 359 Mass. 244, 251 (1971). In litigation between parent and child, judges and juries would naturally be mindful of the relationship and would be even more on the alert for improper conduct.

Further, the insurance company will not be without resources to defend itself against collusion. Under provisions ordinarily included in an insurance policy, the insurance company has the right to disclaim liability when there is lack of cooperation with the insurance company on the part of the insured. See *Cassidy* v. *Liberty Mut. Ins. Co.,* 338 Mass. 139, 142 (1958); *Goldstein* v. *Bernstein,* 315 Mass. 329, 332-334 (1943); *Birnbaum* v. *Pamoukis,* 301 Mass. 559, 562-564 (1938). Lack of cooperation may be found in inconsistent or contradictory statements by the insured (*Salonen* v. *Paanenen,* 320 Mass. 568, 571-572 [1947]) or in collusion between the injured party and the insured which results in false statements to the company. "In all his communications with the company relative to the claim the insured must be truthful and act in good faith. A misstatement concerning a trivial or inconsequential matter or an honest mistake would not constitute a breach of the cooperation clause. . . . But deliberate and wilful falsification of material facts violates the terms of the policy. The furnishing of information known to be false and of a material nature 'either before or at the trial would be a breach of the cooperation clause.'" *Williams* v. *Travelers Ins. Co.,* 330 Mass. 476, 479 (1953), quoting in part from *Salonen, supra* at 571. Accord, *Employers' Liab. Assurance Corp.* v. *Vella,* 366 Mass. 651, 654-655 (1975);

trial courts have been able to deal with the problems effectively." *Immer* v. *Risko,* 56 N.J. 482, 492 (1970). See *Balts* v. *Balts,* 273 Minn. 419, 431 (1966).

*Lombardi* v. *Lumbermens Mut. Cas. Co.*, 361 Mass. 310, 311 (1972).

The existence of collusion and lack of cooperation is not difficult to establish in the ordinary motor vehicle accident case. Prompt, effective insurance company investigation and the requirement of prompt reports of accidents to the registry of motor vehicles and to the insurer quickly establish the essential facts. Normally, any attempt at deviation from the facts by the insured will be speedily evident and will warrant disclaimer by the insurance carrier. The parent is usually represented by counsel provided by the insurance company. Such counsel is ever alert to protect the interests of the insurance company and ready to expose any attempts at collusive and fraudulent conduct. Any overt attempt at collusion constitutes a criminal offense and will be punishable as such.

Some collusive claims may succeed. But this does not justify the formulation of a rule of blanket denial of recovery for all minors. It would be unjust to bar arbitrarily the claims of injured minors deserving of relief solely because some cases may involve possible collusion between two parties.[19] See *France* v. *A.P.A. Transp. Corp.*, 56 N.J. 500, 505 (1970); *Falco* v. *Pados, supra.*

We limit our holding to the circumstances of the case before us: an automobile tort action brought by an unemancipated minor child against a parent. Allowance of such an action neither undermines "parental authority and discipline" (*Luster* v. *Luster,* 299 Mass. 480, 481 [1938]) nor threatens substitution of judicial discretion for parental discretion in the care and rearing of minor

---

[19]"It would be a sad commentary on the law if we were to admit that the judicial processes are so ineffective that we must deny relief to a person otherwise entitled because in some future case a litigant may be guilty of fraud or collusion. Once that concept were accepted, then all causes of action should be abolished." *Gibson* v. *Gibson,* 3 Cal. 3d 914, 920 (1971), quoting from *Klein* v. *Klein,* 58 Cal. 2d 692, 696 (1962).

children. Neither parental authority and discipline nor parental discretion in child care is called into question by an automobile accident case. *Badigian* v. *Badigian,* 9 N.Y.2d 472, 478-479 (1961) (Fuld, J., dissenting). See *Borst* v. *Borst,* 41 Wash. 2d 642, 651-652 (1952). We are mindful that there may be parental exercises of discretion and authority which should be immune from scrutiny in a court of law. However, we are not here confronted with such cases and we need not speculate as to the scope of our holding.[20] That scope will be determined by following the logic and policy of the present decision.

Our holding abrogating parental immunity in the circumstances of this case does not create a new legal duty where none previously existed. *Johnson* v. *Myers,* 2 Ill. App. 3d 844, 845 (1972). Rather, we merely remove the barrier to the enforcement of liability between parent

---

[20] A number of distinct lines of cases with different limitations on abrogation of parental immunity have emerged in other jurisdictions. For example, in Wisconsin (*Goller* v. *White,* 20 Wis. 2d 402, 413 [1963]), and jurisdictions following *Goller,* the doctrine is abrogated "except in these two situations: (1) [w]here the alleged negligent act involves an exercise of parental authority over the child; and (2) where the alleged negligent act involves an exercise of ordinary parental discretion with respect to the provision of food, clothing, housing, medical and dental services, and other care." Accord, e.g., *Streenz* v. *Streenz,* 106 Ariz. 86, 89 (1970); *Plumley* v. *Klein,* 388 Mich. 1, 8 (1972); *Silesky* v. *Kelman,* 281 Minn. 431, 442 (1968). See *Ourada* v. *Knahmuhs,* 301 Minn. 131, 133 (1974); *Cherry* v. *Cherry,* 295 Minn. 93, 95 (1972); *Thoreson* v. *Milwaukee & Suburban Transp. Corp.,* 56 Wis. 2d 231 (1972). In *Smith* v. *Kauffman,* 212 Va. 181, 186 (1971), the Virginia court abrogated the doctrine solely as to automobile torts. See *Wright* v. *Wright,* 213 Va. 177, 179 (1972). In *Gibson* v. *Gibson,* 3 Cal. 3d 914, 921 (1971), the California court rejected the *Goller* limitations. It said that "the proper test of a parent's conduct is this: what would an ordinarily reasonable and prudent *parent* have done in similar circumstances?" For cases which may reflect agreement with *Gibson* see, e.g., *Petersen* v. *City & County of Honolulu,* 51 Hawaii 484 (1969); *Holodook* v. *Spencer,* 36 N.Y.2d 35, 43-45 (1974); *Gelbman* v. *Gelbman,* 23 N.Y.2d 434 (1969).

and child.[21]   *Gelbman* v. *Gelbman,* 23 N.Y.2d 434, 439 (1969).   "Such immunity as the parent may have from suit by the minor child for personal tort, arises from a disability to sue, and not from lack of violated duty." *Dunlap* v. *Dunlap,* 84 N.H. 352, 372 (1930).

Having said this, we conclude that we may apply our holding to the case before us.   We need not decide whether that holding is to be given retroactive or prospective effect; we leave consideration of that question to a future case where the issue is fully argued by the parties.   Compare *Mounsey* v. *Ellard,* 363 Mass. 693 (1973), with *Bouchard* v. *DeGagne,* 368 Mass. 45 (1975).

> *Order allowing motion for judgment on the pleadings reversed.*
>
> *Judgment reversed.*

---

[21]In *Luster* v. *Luster,* 299 Mass. 480, 483 (1938), Justice Qua wrote in the context of a discussion of the effect of insurance on the parent-child immunity:   "Aside from a certain incongruity in attempting to bend general rules of liability so that their application . . . shall depend upon the existence . . . of insurance against liability, it would seem that insurance does not remove the fundamental objections to such an action as this."   "Liability" is a word of art and has reference to culpability or violation of a legal duty.   In considering the doctrine of parent-child immunity, contrary to Justice Qua's language, we are not concerned with a rule of liability but with a complete bar to an action, regardless of culpability.   The parent-child immunity is in the nature of a plea in bar.   Although the defendant may have been culpable, the immunity prevents recovery because, for reasons of public policy, the law has created an artificial barrier to the maintenance of the action. Similarly, a minor is protected against suits for breach of contract during minority and a tortfeasor is protected by the statute of limitations after the lapse of statutory time.   Thus, permitting recovery by an unemancipated minor against an insured parent is not the creation of a new liability but rather the elimination of an old bar to recovery, and there is no question here of "attempting to bend general rules of liability."   In addition it would seem that reasons advanced for barring actions between parent and child would not be applicable where the liability has been transferred by a third party.