O'Toole, J.
By this action, the plaintiff seeks a declaration that one or both of the defendants had an obligation to provide it with a legal defense of claims made against it in litigation pending in the United States District Court (Count I) and further seeks an award of damages for their failure to have done so, such failure having been, the plaintiff alleges, a breach of contract (Count II) and a violation of G.L.c. 93A (Count III). In addition to resisting the plaintiffs claims, the defendants have counterclaimed for a declaration opposite to the one sought by the plaintiff: that they were not obliged to defend the plaintiff in the federal litigation.
The defendants have moved for summary judgment in their favor under all three counts of the complaint; the plaintiff has moved for summary judgment in its favor under Count I only. After consideration of the pleadings, the affidavits and other evidentiary materials submitted on the motions, and the briefs and arguments of the parties, the defendants’ motion is allowed, and the plaintiffs is denied.
General Background
The federal case consolidated separate actions by the United States and the Commonwealth of Massachusetts to recover the costs of cleaning up a hazardous waste disposal site in Tyngsboro, Massachusetts, known as the Charles George landfill, and for various related relief under applicable federal and state statutes. The federal action was commenced in 1985, but enforcement action involving the site went back as far as the mid-1970s, when there had been litigation brought by the Commonwealth in the Superior Court against the owners of the site.
The respective complaints in the federal action alleged that the site had been operated as a landfill between 1971 and 1983 and that “(b)etween at least 1973 and 1976 hazardous substances were disposed of at the Site.” First Amended Complaint, ¶¶40, 43, United States of America v. Charles George Trucking Co., Inc., et al., Civil Action No. 85-2463-WD, United States District Court for the District of Massachusetts.
Among the defendants in the federal litigation, in addition to the owners of the landfill, were various companies alleged by the governments to have been “generators” or “transporters” of hazardous waste that was deposited in the landfill. Under the applicable statutes, such entities would be liable for a share of the “response” and other costs associated with cleaning up the site. 42 U.S.C. §9607(a)(3), (4); G.L.c. 21E, §5(a).
*115 Early In 1990, several of these “generator” or “transporter” defendants filed third-party complaints for contribution or similar relief against the plaintiff here, Roche Brothers Barrel & Drum Co., Inc., alleging that it was also a generator of hazardous waste deposited at the site and that it accordingly was bound to share in the cleanup costs. In the subsequent course of events, Roche Brothers denied that it was responsible for the deposit of any hazardous waste at the Charles George landfill, but representatives of Roche Brothers did acknowledge in the course of pretrial discovery that the company did send waste materials, non-hazardous in their view, to the site for some period beginning in about 1976.
Shortly before the third-pariy complaints were filed, Roche Brothers, through its insurance agent, wrote to the defendant Commercial Union Insurance Company and requested copies of liability insurance policies that had been issued to Roche Brothers by Commercial Union or an affiliate for the period 1974-1977. Commercial Union responded that it could find no record of any policy issued to Roche Brothers. Roche Brothers itself had no copies of any policies, but after some time found reference to a policy number, SMPFBW305426, which appeared to signify a liability policy in effect from December 1975 to December 1976. Relying on this piece of information, on April 12, 1990, counsel for Roche Brothers made a formal demand that Commercial Union assume the defense of the claims made in the federal litigation. Commercial Union took the position that Roche Brothers had not shown the existence or terms of any applicable policy, and it declined to undertake the defense of the federal litigation.
About a year and a half later, in September 1991, the present suit was commenced. Shortly thereafter, Roche Brothers’ lawyer sent Commercial Union’s lawyer a group of documents apparently found in the files of Roche Brothers and its insurance agent that were said to provide evidence of the existence of insurance coverage for the third-pariy claims. From the record presented in connection with the instant motions, it appears that this was the first additional information about potential coverage sent by Roche Brothers since the mention of the policy number in the April 1990, correspondence.
The Existence and Terms of Insurance Policies
Roche Brothers is unable to produce any insurance policy that is applicable to the subject matter of the third-party complaints. What it has produced is some circumstantial evidence of the existence and, to a more limited extent, the terms of policies purchased by it in the 1970s from the defendants. That evidence — the existence and authenticity of which is itself not disputed — permits the following conclusions.
Roche Brothers purchased a “special multi-peril” insurance policy bearing the identifying number SMPFBW305426 from the defendant Employers’ Fire Insurance Company covering the period December 20, 1975 to December 20, 1978 (the “1975 policy”). That policy provided general liability coverage both for bodily injury and property damage claims. The amount of insurance provided under this coverage for property damage was $500,000 for each occurrence and $500,000 aggregate, as of July 23, 1976. The amount of such coverage provided under the policy prior to July 23, 1976, cannot be determined.
Roche Brothers purchased a “special multi-peril” insurance policy bearing the identifying number E-B-40249-56 from the Employers’ Commercial Union Insurance Company, a predecessor of the defendant Commercial Union, covering the period December 20, 1972 to December 20, 1975 (the “1972 policy”). A “special multi-peril” policy is similar to a “comprehensive general liability" policy in usually providing liability coverage for bodily injury and property damage claims against the insured. Such coverage is referred to generally as “Coverage C.” Policy number E-B-40249-56 provided Coverage C insurance, but the amount of such insurance, particularly the amount available for property damage claims, is not known.
The 1972 policy was apparently a “renewal” of, or perhaps more accurately a successor to, a policy identified by the number E-B-40159-53 (the “pre-1972 policy”). Other than a general reference to it as having been “renewed” by the 1972 policy, nothing is known about the kinds or amounts of coverage provided under the pre-1972 policy. (Judging by the numbering code used by the defendants’ group of companies, it can be concluded that the policy was issued by Employers’ Commercial Union Insurance Company.)
As part of its terms, the 1972 policy included the language contained in endorsement MLB-227, in the version revised as of August 1970. That endorsement incorporated the so-called “pollution exclusion” into the insurance contract. The endorsement provided:
It is agreed that the insurance does not apply to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.
There is no evidence showing directly what the terms of the 1975 policy were, or what endorsements it included, but the evidence does show that “special multi-peril” or “comprehensive general liability” policies issued by the defendants at that time typically included an endorsement that contained a pollution exclusion, in the following language:
*116 This insurance does not apply . . .
(f) to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.
The Duty to Defend
An insurer’s duty to defend claims brought against its insured is an obligation that arises from the insurance contract between them; that is, it is rooted in the insurer’s express promise, set forth in the policy language, to defend such claims. See Magoun v. Liberty Mutual Insurance Co., 346 Mass. 677, 679, n. 2 (1964); Sterilite Corp. v. Continental Casualty Co., 17 Mass.App.Ct. 316, 318, n. 4 (1983).[1] Where it exists, the duty to defend is a broad one. “It is axiomatic that an insurance company’s duty to defend is broader than its duty to indemnify.” Boston Symphony Orchestra v. Commercial Union Insurance Co., 406 Mass. 7, 10 (1989). Whether in a particular case the insurer’s duty to defend has arisen is to be determined by considering the allegations of the complaint made against the insured and any additional facts about the claim that are known to the insurer from other sources. Id., at 10-11; Terrio v. McDonough, 16 Mass.App.Ct. 163, 167 (1983). “[T]he process is one of envisaging what kinds of losses maybe proved as lying within the range of allegations of the complaint, and then seeing whether any such loss fits the expectation of protective insurance reasonably generated by the terms of the policy.” Sterilite Corp. v. Continental Casualty Co., supra, at 318.
In the present case, that process produces the conclusion that neither defendant had a duty to defend the third-party claims made against the plaintiff in the federal litigation. Those claims for contribution necessarily reflect the nature of the principal claims made by the United States and the Commonwealth against the “generator” and “transporter” defendants who are the third-party plaintiffs. As noted above, the gist of the claims is that those parties had “generated and by contract, agreement, or otherwise arranged for the disposal of, or for the transport for disposal of, hazardous substances at the Site.” First Amended Complaint, ¶75, United States of America v. Charles George Trucking Co., Inc., et al., Civil Action No. 85-2463-WD, United States District Court for the District of Massachusetts. See also Second Amended Complaint, 140A, Commonwealth of Massachusetts v. Charles George Trucking Co., Inc., et al. Civil Action No. 85-2714-G, United States District Court for the District of Massachusetts. The disposal of hazardous materials at the landfill is alleged in both principal complaints to have occurred over a course ofyears.
As reconstructed from available secondary evidence, both the 1972 policy and the 1975 policy contained a pollution exclusion. The allegations of wrongful acts by the governments in the federal litigation upon which the third-parly claims rest fall unambiguously within the scope of the exclusion. Further, there is nothing in the allegations about the contamination of the landfill either in the primary complaints or in the third-party complaints against Roche Brothers that states or even faintly “adumbrates” (Sterilite Corp. v. Continental Casualty Co., supra, at 318) a claim that the generator defendants were responsible for a “sudden and accidental” discharge as opposed to a gradual one. Lumbermens Mutual Casualty Co. v. Belleville Industries, Inc., 407 Mass. 675, 677-83 (1990); Liberty Mutual Insurance Co. v. SCA Services, Inc., 412 Mass. 330, 334-37 (1992). Thus, that exception to the pollution exclusion is not available to Roche Brothers. Consequently, the “kinds of losses [that] may be proved” do not “fit[ ] the expectation of protective insurance reasonably generated by the terms of the policy,” Sterilite Corp. v. Continental Casualty Co., supra, at 318, and neither defendant had a duty to defend those claims.
Roche Brothers argues that the defendants should be required to bear the burden of defense notwithstanding the absence of a “match” between the claims and the coverage because the defendants did not seek a conclusive determination of their obligations, as by an action for declaratory judgment, when Roche Brothers first demanded that they take up the defense in April 1990. In making this argument, Roche Brothers relies upon the discussion in the Sterilite opinion concerning how an insurer might “get clear of the duly [to defend].” Id., at 323-24. The argument is not persuasive.
First, as of April 1990, the existence and terms of any potentially applicable insurance was a matter of substantial conjecture. From the record presented on these motions, it appears that the various pieces of information that now permit the partial reconstruction of the policies were not sent to the defendants until September 1991, after Roche Brothers had commenced this action for declaratory relief. If there is any obligation on an insurer affirmatively to seek a conclusive answer to the “duty to defend” question, it should not arise from the limited information about potential coverage that the plaintiff gave the defendants in April 1990. By the time the greater information was made available, of course, Roche Brothers’ declaratory judgment suit was already pending. The defendants counterclaimed for a different declaratory judgment, even though that was probably unnecessary since a judgment granting or denying the plaintiffs requested relief would have fully answered the question presented.
*117 Moreover, even if the Sterilite opinion ought properly to be read as establishing a “rule” imposing on insurers who resist a duty to defend an obligation to get some definitive guidance before acting to disclaim such a duty, the “rule” as outlined in that opinion would not apply in the circumstances presented here. Sterilite’s thoughtful exposition of the possible procedures for “getting clear” of the duty to defend refers to contexts in which the duty has arisen, prima facie, as a result of the process of comparing the possibly provable claims against the scope of coverage. The opinion recognizes that further information may thereafter be developed in the course of the litigation that indicates that in fact no claim within the scope of coverage is likely to be proved. In this circumstance, the opinion says, the insurer must do more than unilaterally walk away from the defense. Rather, the insurer must then “demonstrate! ] with conclusive effect on the third party that as a matter of fact — as distinguished from the appearances of the complaint and policy — the third party cannot establish a claim within the insurance.” Id., at 323. But this requirement for such an affirmative “demonstration” arises only “[w]hen . . . the allegations of the third-party complaint find apparent lodgment in the effective coverage of the policy.” Id.
That has not happened in this case. Here, the initial comparison of complaint and policy yields the conclusion that the duly to defend did not arise. There is thús no duty that has arisen to get clear of, and the possible techniques for doing so effectively are beside the point.
Other Claims
If there was no duty to defend Roche Brothers, there could have been no breach of that duty, as alleged in Count II. Likewise, if there was no duty to defend, it was not an unfair or deceptive act or practice within the scope of G.L.c. 93A, §2 or any provision of G.L.c. 176D to have refused to undertake the defense, as alleged in Count III.
Conclusion
In sum: Roche Brothers has not shown, and apparently can not prove at trial (see Kourouvacilis v. General Motors Corp., 410 Mass. 706, 712 (1991)), that either of the defendants provided coverage applicable to the claims made against Roche Brothers for any period prior to December 20, 1972. It has shown sufficiently by secondary evidence that a liability policy for the period December 20, 1972 to December 20, 1975 was issued by Employers’ Commercial Union Insurance Company, a predecessor of the defendant Commercial Union Insurance Company, but it has not shown the amount of insurance provided under that policy. Roche Brothers has also shown sufficiently by secondary evidence that a liability policy for the period December 20, 1975 to December 20, 1978, was issued by the defendant Employers’ Fire Insurance Company, providing an unknown amount of insurance for property damage liability claims before July 23, 1976, and providing $500,000 in such insurance from July 23, 1976 forward. Both the 1972 policy and the 1975 policy contained a “pollution exclusion” clause, the effect of which was to exclude coverage for the claims set forth in the third-party complaints against Roche Brothers inthefederallitigation.Accordingly,neitherdefendant had any obligation to defend Roche Brothers with respect to those claims.
Judgment shall enter under Count I of the complaint and under the counterclaim declaring that neither defendant was obliged to defend the third-party claims brought against Roche Brothers in the federal litigation or to pay any of the costs of defense or settlement. Judgment shall enter in favor of the defendants under Counts II and III, dismissing those Counts with prejudice.

 Strictly speaking, as the policies themselves have not been discovered, there is no direct proof by Roche Brothers that the insurers made such a promise, without which there would be no duty to defend. Nonetheless, the practice of including such a promise in liability policies is so common that the parties have not even commented on the point, in effect assuming that any policy would have included such language, and the Court is probably entitled to take judicial notice of the fact that liability policies customarily include a provision giving the insurer the right and duty to defend claims falling within the scope of the insurance contract’s indemnity. See Sorenson v. Sorenson, 369 Mass. 350, 362 (1975) (taking judicial notice of “the widespread existence of automobile liability insurance”). Moreover, with respect to the 1975 policy, the endorsement that included the “pollution exclusion” also contains a duty-to-defend provision. Affidavit of Daniel R. Lavoie, exhibits 10 and 11.