No. 50,495

ROSANNA NOCKTONICK, a minor, by her guardian Wayne Matson, *Plaintiff-Appellant,* v. REGINA NOCKTONICK, and FARMERS ALLIANCE MUTUAL INSURANCE COMPANY, *Defendant-Appellee.*

(611 P.2d 135)

Opinion filed May 10, 1980.

*Wilburn Dillon, Jr.,* of Topeka, argued the cause and was on the brief for the appellant.

*George F. Farrell, Jr.,* of Benfer and Farrell, of Topeka, argued the cause and was on the brief for the appellee.

*Edward M. Boyle,* of Olathe, was on the brief *amicus curiae* for the Kansas Trial Lawyers Association.

*Donald Patterson* and *J. Steven Pigg,* of Fisher, Patterson, Sayler, and Smith, of Topeka, were on the brief *amicus curiae* for the Kansas Association of Defense Counsel.

The opinion of the court was delivered by

PRAGER, J.: This is an action brought by an unemancipated minor child against her mother to recover damages for personal injuries suffered by the child as the result of an automobile collision. The plaintiff-appellant, Rosanna Nocktonick, was a minor three years of age on October 15, 1976, the date of the collision. She was a passenger in an automobile operated by her natural mother, the defendant-appellee, Regina Nocktonick. The Nocktonick vehicle collided with an automobile driven by Eleanor Milner at the intersection of two county roads in Jackson County, Kansas. The plaintiff's injuries included multiple fractures of her leg, requiring extensive hospitalization.

On August 17, 1977, Regina Nocktonick was appointed conservator of Rosanna for assertion of Rosanna's claim against Eleanor Milner. This claim was satisfied by a settlement which was approved by the court and paid by Milner's insurance company. The settlement was based upon a covenant not to sue, and reserved Rosanna's right to proceed against her mother, Regina. Regina's insurance carrier, Farmers Alliance Mutual Insurance Company, asserted a lien for the PIP benefits paid, and that sum

was refunded from the settlement proceeds pursuant to court order. On October 3, 1977, Wayne Matson, Rosanna's maternal grandfather, was appointed her conservator to pursue her claim against her mother. Rosanna's petition was filed October 5, 1977, against both her mother, Regina, and Farmers Alliance Mutual Insurance Company. In her petition, Rosanna alleged her personal injuries were the result of her mother's negligence in the operation of her motor vehicle. She claimed damages in the amount of $50,000, the limit of her mother's liability insurance coverage. Farmers Alliance was later dismissed as a named party defendant. The defendant, Regina Nocktonick, then moved for summary judgment on the basis that the doctrine of parental immunity barred an action by an unemancipated minor against her parent to recover damages for negligent operation of a motor vehicle. The trial court granted summary judgment, holding that the doctrine of parental immunity should be applied in Kansas to bar such a claim. Plaintiff brought a timely appeal to this court.

This appeal requires us to consider whether an unemancipated minor may recover damages in an action against a parent for injuries allegedly caused by the negligence of the parent in the operation of an insured motor vehicle. This issue has never before been presented to an appellate court in Kansas. In *Miles v. West,* 224 Kan. 284, 580 P.2d 876 (1978), the doctrine of "intrafamily immunity" was referred to in the opinion at page 286 but the issue was not decided.

This court recognized the existence of *interspousal* tort immunity and applied it in *Sink v. Sink,* 172 Kan. 217, 239 P.2d 933 (1952), where it was held that in this state neither spouse may maintain an action in tort for damages against the other. Here, the court is free either to adopt the doctrine of parental immunity or to reject it, without overruling any prior Kansas case law, rejecting any rule of the common law, or invalidating any Kansas statute. Stated simply, our task is to decide which rule best serves the needs of justice in Kansas in the closing years of the twentieth century.

It would be helpful at the outset to discuss generally the history of parental immunity, the justifications usually advanced for its adoption or rejection, and the exceptions to the doctrine adopted in various cases. There is a comprehensive annotation on the subject of "Liability of Parent for Injury to Unemancipated Child

Caused by Parent's Negligence" in 41 A.L.R.3d 904. There the views presently followed in the various states are discussed in depth and the cases supporting each position are cited. All of the cases agree that parental immunity in tort is a creature of relatively recent American jurisprudence. The early English law is discussed at length in McCurdy, *Torts Between Persons in Domestic Relation,* 43 Harv. L. Rev. 1030, 1031-1050 (1930). It is clear that both the English and American cases have long permitted actions between parent and minor child in disputes involving property rights. Professor Prosser has suggested that there is no good reason to think that the English law would not permit actions for personal torts as well, subject always to the parent's privilege to enforce reasonable discipline against the child. Prosser, Law of Torts § 122 (4th ed. 1971). Prosser points out that there are decisions in Canada and Scotland holding that such an action will lie. Other legal scholars have concluded that there is nothing in the English law which precludes an action in tort by a minor who has been wronged by his parent. *Hebel v. Hebel,* 435 P.2d 8 (Alaska 1967); 1 Harper & James, Law of Torts § 8.11 (1956). Thus, the general consensus seems to be that the doctrine of parental immunity has no foundation in the English law, but originated in the United States.

The doctrine of parental immunity was judicially created in a Mississippi case, *Hewlett v. Ragsdale,* 68 Miss. 703, 9 So. 885 (1891). In *Hewlett,* an unemancipated minor brought an action against her mother for the child's illegal imprisonment in an insane asylum motivated by the mother's desire to obtain the child's property. The Mississippi Supreme Court refused to entertain the daughter's claim, giving the following explanation:

"[S]o long as the parent is under obligation to care for, guide and control, and the child is under reciprocal obligation to aid and comfort and obey, no such action as this can be maintained. The peace of society, and of the families composing society, and a sound public policy, designed to subserve the repose of families and the best interest of society, forbid to the minor child a right to appear in court in the assertion of a claim to civil redress for personal injuries suffered at the hands of the parent. The state, through its criminal laws, will give the minor child protection from parental violence and wrongdoing, and this is all the child can be heard to demand." p. 711.

The Mississippi court cited no authority in support of its holding.

The *Hewlett* decision was followed by *McKelvey v. McKelvey,* 111 Tenn. 388, 77 S.W. 664 (1903), in which a minor was

precluded from asserting a claim for damages resulting from cruel and unusual treatment at the hands of her father and stepmother. The court concluded that sound public policy supported the decision. Two years later in 1905, in *Roller v. Roller,* 37 Wash. 242, 79 Pac. 788 (1905), the Supreme Court of Washington reversed a decision in favor of an unemancipated female child who had been raped by her father. The court held that such an action between the father and daughter did not lie because of the interest that society had in preserving harmony in domestic relations. *Roller* was an aggravated case, and plaintiff's counsel suggested to the court that the child having been raped by her father, it would seem that the harmonious relationship had already been disrupted. The court rejected this argument stating that "if it be once established that a child has a right to sue a parent for a tort, there is no practical line of demarcation which can be drawn." p. 244. Hence the child was denied a remedy. Following these cases, most of the jurisdictions in the United States adopted the doctrine of parental immunity, holding that an unemancipated minor child may not maintain an action in tort against a parent to recover damages for personal injuries.

The doctrine of parental immunity has been justified on the basis of public policy. There are five policy reasons primarily relied on to support it:

(1) Disturbance of domestic harmony and tranquility;
(2) Interference with parental care, discipline, and control;
(3) Depletion of family assets in favor of the claimant at the expense of other children in the family;
(4) Possibility of inheritance by the parent of the amount recovered in damages by the child; and
(5) The danger of fraud and collusion between parent and child.

Domestic tranquility and interference with parental discipline, care, and control are the policy reasons most frequently offered by courts which have approved the rule. *Skinner v. Whitley,* 281 N.C. 476, 189 S.E.2d 230 (1972); *Barlow v. Iblings,* 261 Iowa 713, 156 N.W.2d 105 (1968). In support of parental immunity, many courts have relied heavily upon the interspousal immunity between husband and wife, pointing out that the same public policy is applicable to parent-child relationships as to husband-wife relationships.

After the parental immunity doctrine had become well accepted, many legal scholars and judges began to criticize the doctrine on the basis that its practical effect was to produce manifest injustice in many factual situations. See for example, Prosser, Law of Torts § 122 at 864; 1 Harper & James, Law of Torts § 8.11 at 650. Some of the writers point out the fact that litigation between parent and child over property rights is quite common, yet family harmony has seemed to survive. These writers argue that the law cannot reasonably make a distinction between the enforcement of property rights and the enforcement of personal rights. Furthermore, the "family harmony" rationale has been rejected on the basis that it is improbable that a suit would be filed against a parent by a child where there is not already discord in the family. *Sorensen v. Sorensen,* 369 Mass. 350, 339 N.E.2d 907 (1975). Others have questioned why a child not related to the tortfeasor should be permitted to recover in situations where a child of the tortfeasor is precluded from recovery, and, further, why an emancipated sibling, age 18, should have a cause of action against a parent for personal injury where an unemancipated child, age 17, does not.

These criticisms resulted in a series of judicial decisions which have eroded the doctrine by the creation of numerous exceptions to it. Today, there are very few jurisdictions, if any, which recognize parental immunity in its absolute form. The exceptions to the doctrine which have been recognized by various courts are the following:

(1) As noted above, parental immunity was never extended beyond personal torts. It has never been recognized in cases in tort affecting only property, such as trespass to land or deceit.

(2) It was held almost from the beginning that the immunity did not apply to adult children or to minor children who had been emancipated by the surrender of parental control over them.

(3) Some courts hold that, where death has terminated the parent-child relationship, there is no longer any basis to apply the parental immunity rule, thus making it appropriate for claims to be brought against the child's estate or the parent's estate for personal wrongs. *Dean v. Smith,* 106 N.H. 314, 211 A.2d 410 (1965); *Johnson v. Myers,* 2 Ill. App. 3d 844, 277 N.E.2d 778 (1972).

(4) Another exception, recognized fairly early and supported by

a good many decisions, has been that there is no immunity for the intentional or reckless infliction of bodily harm. This exception has been adopted on the theory that a parent who intentionally inflicts bodily harm on his child steps outside of his capacity as a parent. One application of this exception has been in the case of a parent who injures his child by his drunken driving of an automobile. *Kobylanski v. Board of Education,* 22 Ill. App. 3d 551, 317 N.E.2d 714 (1974); *Hoffman v. Tracy,* 67 Wash. 2d 31, 38, 406 P.2d 323 (1965).

(5) Another exception is that there is no immunity for bodily harm inflicted by conduct that is merely negligent, if the harm is inflicted in the course of a business activity carried on by the parent. The explanation usually given is that the parent has not injured his child while acting in his capacity as a parent but rather in his capacity of one conducting a business enterprise and that the enterprise should have no parental immunity. See *Farley v. M M Cattle Company,* 529 S.W.2d 751 (Tex. 1975); *Cody v. J.A. Dodds & Sons,* 252 Iowa 1394, 110 N.W.2d 255 (1961).

(6) It has been held that the immunity of the parent or child is a personal one that does not protect a third party who is liable for the tort of either. Thus, when a parent within the scope of his employment by another negligently inflicts personal injury upon his own child, his employer is not protected by the parent's immunity and is subject to liability to the child as if the negligence had been that of the employer himself. *Stapleton v. Stapleton,* 85 Ga. App. 728, 70 S.E.2d 156 (1952); *Mi-Lady Cleaners v. McDaniel,* 235 Ala. 469, 179 So. 908 (1938).

(7) The immunity of the parent has not been extended to the case of one who stands *in loco parentis*—one who performs the functions of a parent without being one. When there is bodily harm inflicted by a stepfather, a grandparent, or a teacher looking after the child, there is no immunity. Thus, in a second marriage, the husband may be liable for negligent injury to the wife's children but is not liable for injuries suffered by his own although arising out of the same negligent act.

(8) In recent years, several jurisdictions have carved an exception to the parental immunity rule to allow the child to sue his parent for injuries caused by the negligent operation of a motor vehicle. See for example, *Streenz v. Streenz,* 106 Ariz. 86, 471 P.2d 282 (1970); *Sorensen v. Sorensen,* 369 Mass. 350. The main

justification relied on for allowing an action by a child against a parent in automobile accident cases is the prevalence of automobile liability insurance. While courts concede the existence of automobile insurance cannot create liability where none before existed, the prevalence of liability insurance has been held to be a proper factor to consider in determining the applicability of parental immunity. The courts which have recognized this exception have proceeded on the theory that where the reason for a rule of law no longer exists, the rule itself ceases. The existence of liability insurance is, therefore, recognized as preventing family discord and depletion of the family exchequer in automobile negligence cases. See for example *Goller v. White,* 20 Wis. 2d 402, 411, 122 N.W.2d 193 (1963); *Sorensen v. Sorensen,* 369 Mass. at 362.

Prior to 1963, the only attempt at complete abrogation of parental immunity had been made by an intermediate appellate court in *Wells v. Wells,* 48 S.W.2d 109 (Mo. App. 1932), but that decision was not followed by other courts. In 1963, in *Goller v. White,* 20 Wis. 402, the Supreme Court of Wisconsin abrogated parental immunity in negligence cases except in two situations: (1) Where the alleged negligent act involves an exercise of parental authority over the child, and (2) where the alleged negligent act involves an exercise of ordinary parental discretion with respect to the provision of food, clothing, housing, medical and dental services, and other care. *Goller* has now been followed by a substantial minority of jurisdictions. See for example, *Plumley v. Klein,* 388 Mich. 1, 199 N.W.2d 169 (1972); *Hebel v. Hebel,* 435 P.2d 8. In recent years seven jurisdictions have abolished parental immunity without restrictions:

California — *Gibson v. Gibson,* 3 Cal. 3d 914, 918, 92 Cal. Rptr. 288, 479 P.2d 648 (1971);

Hawaii — *Petersen v. City & County,* 51 Hawaii 484, 462 P.2d 1007 (1969);

Nevada — *Rupert v. Stienne,* 90 Nev. 397, 528 P.2d 1013 (1974);

New Hampshire — *Briere v. Briere,* 107 N.H. 432, 224 A.2d 588 (1966);

New York — *Hairston v. Broadwater,* 73 Misc. 2d 523, 342 N.Y.S.2d 787 (1973);

*Gelbman v. Gelbman,* 23 N.Y.2d 434, 297 N.Y.S.2d 529, 245 N.E.2d 192 (1969);

North Dakota — *Nuelle v. Wells,* 154 N.W.2d 364 (1967); Pennsylvania — *Falco v. Pados,* 444 Pa. 372, 282 A.2d 351 (1971).

It is obvious from this historical review of the doctrine of parental immunity, with its many exceptions, that there has been a wide variance in the acceptance and application of the rule throughout this country.

In 1977, the American Law Institute adopted § 895G of the Restatement (Second) of Torts (1979), which rejected the immunity from liability in tort between parent and child. In lieu thereof, it recognized privileges arising out of the parent-child relationship. It states as follows:

"§ 895G. Parent and Child.

"(1) A parent or child is not immune from tort liability to the other solely by reason of that relationship.

"(2) Repudiation of general tort immunity does not establish liability for an act or omission that, because of the parent-child relationship, is otherwise privileged or is not tortious."

In the comment to § 895G, the Restatement discusses the history, justifications, exceptions, and abrogation of the doctrine of parental immunity. The comment to subsection (2) states in part as follows:

"*k.* With the abrogation of the general tort immunity between parent and child, the courts soon discovered that there still remain difficult problems of determining when a physical harm should be regarded as actionable. Intentional infliction of physical harm might appear to be clearly tortious. But there is the privilege of parental discipline. (See §§ 147-155). The intimacies of family life also involve *intended physical contacts that would be actionable between strangers but may be* commonplace and expected within the family. Family romping, even roughhouse play and momentary flares of temper not producing serious hurt, may be normal in many households, to the point that the privilege arising from consent becomes analogous.

"The intimacies of family life also affect the determination of whether conduct is negligent or not. If the conduct giving rise to an injury does not grow directly out of the family relationship, the existence of negligence may be determined as if the parties were not related. A similar attitude is taken regarding the driving of an automobile on the street or highway; most of the cases abrogating the immunity have involved automobile accidents.

"Conduct involving the exercise of parental authority or supervision is essential to the parent-child relationship. This is also true of the performance of parental duties such as the use of care to provide a safe place to live or adequate necessaries or proper instruction and training. Parental discretion is involved, and to say that the standard of a reasonable prudent parent is applied should be to recognize the

existence of that discretion and thus to require that the conduct be palpably unreasonable in order to impose liability. . . .

"Just as the parent-child relationship creates an analogy to consent in the case of an intentional tort, so in the case of a negligent tort there is an analogy to the defense of assumption of risk. For activities central to that relationship, particularly within the home itself, there is some relaxation of the stricter standard of conduct applied in dealing with third persons. A child thoughtlessly leaves his skates in a hallway and the parent trips over them or slides on them and falls, or a parent delays fixing a slightly broken step or calling in a carpenter to do it and the child falls as a result; these occurences are normally regarded as commonplace incidents in family life and usually treated as accidents rather than the basis for imposing legal liability.

"These problems are comparatively new to the courts as a result of the recent abrogation of immunity, and the courts have not yet worked out a full analysis of the proper legal treatment. The reasons put forward for a general tort immunity still carry weight and some courts conclude that there should be a remaining immunity for certain types of activities. The analysis here, however, seems more appropriate than the granting of a categoric immunity for these types of activities, regardless of the blatancy of the negligence or the wilfulness of the conduct.

"Ostensibly extraneous matters that have significantly affected some decisions in the past and will probably continue to do so, include the presence of liability insurance and the fact that a suit is brought by a third-party defendant for contribution rather than by the injured party for compensation."

As we observed in the beginning, our task is to decide which rule best serves the needs of justice in Kansas in the closing years of the twentieth century. In so doing, we must recognize that the more recent decisions rejecting parental immunity are indicative of a "growing judicial distaste for a rule of law which in one sweep disqualified an entire class of injured minors." *Gibson v. Gibson,* 3 Cal. 3d at 918. We believe that the authorities which favor abrogation of the parental immunity doctrine state the proper approach in light of modern conditions and conceptions of public policy. We see no good reason why children should not enjoy the same right to protection and to legal redress for wrongs done them as others enjoy. We question the view that a regard for family harmony and tranquility necessitates denial of tort recovery to a child injured in an automobile accident.

We are inclined to agree with Judge Fuld's dissent in *Badigian v. Badigian,* 9 N.Y.2d 472, 478, 215 N.Y.S.2d 35, 174 N.E.2d 718 (1961), which states in part as follows:

"Those parents who are worthy of affection will make provision for the crippled child to the extent of their ability without the spur of legal process. The child will be unwilling to sue, will have no need or thought to sue. What is right will be done, and it will be done out of love that is stronger than the law. There may be

some parents who are selfish or indifferent or cruel; if they turn the crippled child adrift when his minority is over, he will be a drag upon society and a burden to himself. We should say that they may not do so with impunity. There are other parents who, though willing, may be helpless. We should hold that the child is not to be denied the benefit of insurance that would be available for a stranger."

We have concluded that, under the factual circumstances of this case, an unemancipated minor child may recover damages in an action brought against a parent for personal injuries caused by the negligence of the parent in the operation of a motor vehicle. This conclusion is consistent with a growing list of states which, in recent years, have adopted this position. States which have abolished parental immunity in all cases or in automobile accident cases include:

Alaska — *Hebel v. Hebel,* 435 P.2d 8 (1967);

Arizona — *Streenz v. Streenz,* 106 Ariz. 86, 471 P.2d 282 (1970);

California — *Gibson v. Gibson,* 3 Cal. 3d 914, 92 Cal. Rptr. 288, 479 P.2d 648 (1971);

Connecticut — G.S. 1979 Supp. 52-572c;

Hawaii — *Tamashiro v. De Gama,* 51 Hawaii 40, 450 P.2d 998 (1969);

Petersen v. City & County, 51 Hawaii 484, 462 P.2d 1007 (1969);

Illinois — *Schenk v. Schenk,* 100 Ill. App. 2d 199, 241 N.E.2d 12 (1968);

Kentucky — *Rigdon v. Rigdon,* 465 S.W.2d 921 (1971);

Massachusetts — *Sorensen v. Sorensen,* 369 Mass. 350, 339 N.E.2d 907 (1975);

Michigan — *Plumley v. Klein,* 388 Mich. 1, 199 N.W.2d 169 (1972);

Minnesota — *Silesky v. Kelman,* 281 Minn. 431, 438-439, 161 N.W.2d 631 (1968);

New Hampshire — *Briere v. Briere,* 107 N.H. 432, 224 P.2d 588 (1966);

New Jersey — *France v. A.P.A. Transport Corp.,* 56 N.J. 500, 267 A.2d 490 (1970);

New York — *Gelbman v. Gelbman,* 23 N.Y.2d 434, 297 N.Y.S.2d 529, 245 N.E.2d 192 (1969);

Nevada — *Rupert v. Stienne,* 90 Nev. 397, 528 P.2d 1013 (1974);

North Carolina — G.S. 1979 Supp. 1-539.21;

North Dakota — *Nuelle v. Wells,* 154 N.W.2d 364 (1967);

Pennsylvania — *Falco v. Pados,* 444 Pa. 372, 282 A.2d 351 (1971);

Virginia — *Smith v. Kauffman,* 212 Va. 181, 183 S.E.2d 190 (1971);

West Virginia — *Lee v. Comer,* 224 S.E.2d 721 (W. Va. 1976). It should be noted that the states listed above have followed for many years the rule which we have adopted today. Yet there apparently has been no significant disruption in family relationships as grimly predicted by the prophets of doom who insist on the application of parental immunity in automobile negligence cases.

We believe that the argument that parental immunity is necessary to preserve the tranquility and harmony of domestic life misconceives the facts of domestic life. The primary disruption to harmonious family relationships is not the lawsuit brought for damages after the injury but the injury itself, resulting from the misconduct of a parent. *Falco v. Pados,* 444 Pa. at 380. It can hardly aid family reconciliation to deny an injured child access to the courts and, through them, to any liability insurance which the family might maintain.

In Kansas, motor vehicle liability insurance is mandatory under K.S.A. 1979 Supp. 40-3104. The required contents of each insurance policy are set out in K.S.A. 1979 Supp. 40-3107. Although insurance cannot create liability where no legal duty previously existed, it remains, nevertheless, a proper element to be considered in a discussion of the public policy supporting abrogation of parental immunity. As pointed out in *Streenz v. Streenz,* where liability insurance exists, the domestic tranquility argument is hollow, for in reality the sought after litigation is not between child and parent but between child and parent's insurance carrier. Far from being a potential source of disharmony, the action is more likely to preserve the family unit in pursuit of a common goal—the easing of family financial difficulties stemming from the child's injuries. *Gelbman v. Gelbman,* 23 N.Y.2d at 438; *Goller v. White,* 20 Wis. 2d at 412.

We recognize a practical problem is that of possible collusion between parent and child aimed at securing an unjustified recovery from an insurance company. But the possibility of collusion exists to a certain extent in any case. Every day we depend on

juries and trial judges to sift evidence in order to determine the facts and arrive at proper verdicts. Experience has shown that the courts are quite adequate for this task. In litigation between parent and child, judges and juries would naturally be mindful of the relationship and would be even more on the alert for improper conduct. We further must recognize that, under provisions ordinarily included in an insurance policy, the insurance company has the right to disclaim liability when there is lack of cooperation with the insurance company on the part of the insured. Lack of cooperation may be found in inconsistent or contradictory statements by the insured or in collusion between the injured party and the insured which results in false statements to the company.

In *Sorensen v. Sorensen,* 369 Mass. at 365, the court commented on the danger of collusion between parent and child in the following language:

"The existence of collusion and lack of cooperation is not difficult to establish in the ordinary motor vehicle accident case. Prompt, effective insurance company investigation and the requirement of prompt reports of accidents to the registry of motor vehicles and to the insurer quickly establish the essential facts. Normally, any attempt at deviation from the facts by the insured will be speedily evident and will warrant disclaimer by the insurance carrier. The parent is usually represented by counsel provided by the insurance company. Such counsel is ever alert to protect the interests of the insurance company and ready to expose any attempts at collusive and fraudulent conduct. Any overt attempt at collusion constitutes a criminal offense and will be punishable as such.

"Some collusive claims may succeed. But this does not justify the formulation of a rule of blanket denial of recovery for all minors. It would be unjust to bar arbitrarily the claims of injured minors deserving of relief solely because some cases may involve possible collusion between two parties (citations omitted)."

The possibility of collusion was advanced as an argument to justify the Kansas guest statute which was held unconstitutional in *Henry v. Bauder,* 213 Kan. 751, 518 P.2d 362 (1974). In *Henry,* we rejected this argument, stating that it is unreasonable to eliminate causes of action of an entire class of persons simply because some undefined portion of the designated class may file fraudulent lawsuits. We emphasized that courts must depend upon the efficiency of the judicial processes to ferret out the meritorious from the fraudulent in particular cases.

Our holding is limited to the factual circumstances of the case now before us—an automobile tort action brought by an unemancipated minor child against a parent. Allowance of such an

action does not undermine parental authority and discipline nor does it threaten to substitute judicial discretion for parental discretion in the care and rearing of minor children. We recognize that there may be parental exercises of discretion and authority which should be provided special protection in a court of law. Here we merely remove any barrier to the enforcement of liability between parent and child in an automobile accident case brought by an unemancipated minor against a parent. When confronted with other cases involving claimed parental immunity, we will at that time determine to what extent parental immunity or privilege should be recognized under the particular circumstances of the case then before us.

For the reasons set forth above the judgment of the district court is reversed. The case is remanded to the district court with directions to set aside the order of summary judgment entered below and to permit the parties to proceed with the determination of the issues presented in the case.

SCHROEDER, C.J., dissenting: The majority has attempted to beat a careful, well-measured retreat from the doctrine of parental immunity for negligent torts against unemancipated children. However, I am not deceived by the attempt to limit this monumental shift in policy to auto negligence cases. The *rationale* and *policy* behind the majority opinion subjects Kansas families to the constant threat of litigation for *all negligent acts* of the parents.

Justice McFarland of the Arizona Supreme Court expressed similar fears in his excellent dissent in *Streenz v. Streenz,* 106 Ariz. 86, 89-90, 471 P.2d 282 (1970), stating:

"I am forced to dissent because there has been presented no persuasive authority that the cure proposed by the majority is not worse than the disease.

"The single question presented in this case is simple enough: should an unemancipated child be permitted to maintain a cause of action against its parents for damages resulting from the parents' tortious conduct. Although this is an automobile negligence case, the striking down of the immunity doctrine is not limited to this field. The implications in the majority opinion make it plain that the area they have opened is analogous to Gertrude Stein's famous Rose; a tort is a tort is a tort. If the immunity from suit is removed for an automobile tort, it follows logically that it is removed for all negligent acts—for example, those which may occur in the sanctity of the home. Needless to say, the 'sanctity' also includes the 'secrecy' of the home.

"A vacuum cleaner forgetfully kept near an entrance; an open, live toaster wire

carelessly ignored by the do-it-yourself father; a teakettle or pot of boiling water unthinkingly left within the reach of a toddler, all become the elements of a suit by the infant child against his parents. It takes but little imagination to conceive of almost unlimited examples. Liability lurks in every corner of the household. And when tragedy strikes through the inadvertent, but nevertheless tortious, hand of the child's parent (let us say the father), that same parent must decide—or at least participate in a family decision—whether or not suit should be instituted for the benefit of the child. The father must decide whether his duties as a father compel him to pass upon the possibility of a recovery against himself for accidental injuries to his child of tender years and take the child to some one to act as guardian ad litem to bring the suit against himself. The father must then assume the role of the defendant, and, presumably, assist in good faith in the defense of the suit in accordance with the terms of the 'cooperation clause' of his insurance policy."

The majority attacks the historical basis of the doctrine, reciting the absence of citations in the original Mississippi case and the absence of an English common law background. That is the mode of attack consistently used by the opponents of parental immunity. Just as consistently, those attackers downplay the significant fact that a numerical majority of courts have considered the merits of parental immunity and have adopted or retained it. See *Owens v. Auto Mut. Indemnity Co.*, 235 Ala. 9, 177 So. 133 (1937); *Welter v. Curry*, 260 Ark. 287, 539 S.W.2d 264 (1976); *Rambo v. Rambo*, 195 Ark. 832, 114 S.W.2d 468 (1938); *Trevarton v. Trevarton*, 151 Colo. 418, 378 P.2d 640 (1963); *Reaves v. Horton*, 33 Colo. App. 186, 518 P.2d 1380 (1973); *Strahorn v. Sears, Roebuck & Co.*, 50 Del. 50, 123 A.2d 107 (1956); *Orefice v. Albert*, 237 So.2d 142 (Fla. 1970); *Horton v. Unigard Ins. Co.*, 355 So.2d 154 (Fla. App. 1978); *Wisenbaker v. Zeigler*, 140 Ga. App. 90, 230 S.E.2d 97 (1976); *Eschen v. Roney*, 127 Ga. App. 719, 194 S.E.2d 589 (1972); *Vaughan v. Vaughan*, 161 Ind. App. 497, 316 N.E.2d 455 (1974); *Barlow v. Iblings*, 261 Iowa 713, 156 N.W.2d 105 (1968); *Downs v. Poulin*, 216 A.2d 29 (Me. 1966); *Montz v. Mendaloff*, 40 Md. App. 220, 388 A.2d 568 (1978); *McNeal v. Administrator of Estate of McNeal*, 254 So.2d 521 (Miss. 1971); *Bahr v. Bahr*, 478 S.W.2d 400 (Mo. 1972); *State Farm Mutual v. Leary*, 168 Mont. 482, 544 P.2d 444 (1975); *Pullen v. Novak*, 169 Neb. 211, 99 N.W.2d 16 (1959); *Nahas v. Noble*, 77 N.M. 139, 420 P.2d 127 (1966); *Teramano v. Teramano*, 6 Ohio St. 2d 117, 216 N.E.2d 375 (1966); *Chaffin v. Chaffin*, 239 Or. 374, 397 P.2d 771 (1964); *Castellucci v. Castellucci*, 96 R.I. 34, 188 A.2d 467 (1963); *Gunn v. Rollings*, 250 S.C. 302, 157 S.E.2d 590 (1967); *Campbell*

*v. Gruttemeyer,* 222 Tenn. 133, 432 S.W.2d 894 (1968); *Felder-hoff v. Felderhoff,* 473 S.W.2d 928 (Texas 1971); *Stevens v. Murphy,* 69 Wash. 2d 939, 421 P.2d 668 (1966); *Oldman v. Bartshe,* 480 P.2d 99 (Wyo. 1971).

Again, Arizona's Justice McFarland persuasively writes:

"[P]arental immunity became one of the established laws of the land; but not without a severe process of judicial refinement which, over many years and many decisions, struck away the sharp edges of severity spawned by the original trilogy, and honed it into a workable law. The majority opinion views this process as 'evincing hostility for the doctrine.' I consider this continued engraftment of exceptions on the application of any rule to be normal, judicial procedure. Judicial exceptions are equally compatible with the concept of improvement as they are with destruction.

"However, it seems immaterial now whether parental immunity descended from the Common Law, or is a creature of the American judiciary. The doctrine has become firmly imbedded in our jurisprudence over a span of eighty years by virtue of innumerable decisions from almost every State in the Union. I do not believe that courts should slavishly follow precedents. Judges are not eternally shackled to the decisions of their predecessors. On the other hand, I do not believe that precedents can be lightly disregarded. Mr. Justice Jackson aptly describes this in an article in Col. L. Rev. 45:1, at 26:

" '. . . While Judge Cardozo pointed out with great accuracy that the power of the precedent is only "the power of the beaten track," still the mere fact that a path is a beaten one is a persuasive reason for following it. . . .'

"I find it inconceivable that so many courts have walked in error for so many years even up to the present." 106 Ariz. at 94.

The validity and significance of the original reasons for adopting the parental immunity doctrine have not waned. Domestic tranquility, proper parental discipline and control, family unity, and social responsibility are integral elements of America's success as a nation and culture. In our free society, at a time when government and institutions are daily encroaching on the sanctity of the nuclear family, *it is crucial to reaffirm our dependence on the family unit.* The parent-child relation is the fertile basis for the care, education, moral and spiritual training of our children. The words of the majority in *Small v. Morrison,* 185 N.C. 577, 584-85, 118 S.E. 12 (1923), ring true today:

"We think this argument, however, is more than overcome by practical considerations of public policy, which discourage causes of actions that tend to destroy parental authority and to undermine the security of the home. No greater disservice could be rendered to any child than to teach its feet to stray from the path of rectitude, or to suffer its mind to be poisoned by ideas of disloyalty and dishonor. The policy heretofore established in this state with respect to the maintenance of the family as the social unit is diametrically opposed to the communistic theory

which Russia has unsuccessfully sought to put into practice. From the very beginning the family in its integrity has been the foundation of American institutions, and we are not now disposed to depart from this basic principle. Freedom in this country is the self-enforcement of self-enacted laws; and liberty with us is the right to go and do as you please under the law, or so long as you please to do right. Hence, in a democracy or a polity like ours, the government of a well-ordered home is one of the surest bulwarks against the forces that make for social disorder and civic decay. It is the very cradle of civilization, with the future welfare of the commonwealth dependent, in a large measure, upon the efficacy and success of its administration. Under these conditions, the state will not and should not permit the management of the home to be destroyed by the individual members thereof, unless and until the interests of society itself are threatened. Whenever this occurs, adequate provision for the protection of the community, as well as the members of the family involved, has been supplied in the form of juvenile courts, welfare officers, etc. To say that a minor child, while living in the household of its parents, must be given the right to sue the latter for a tort committed, or else be declared an 'outlaw,' is simply begging the question and overlooking entirely the consequences that such a proceeding would have upon the household of which said child is an important member and component part. In this society of ours, complex as it is, all rights are relative; and the courts, as well as the Legislature, must look to the larger good and not merely to the smaller hope. They are not to be 'penny wise and pound foolish.' "

Following a similar rationale, the Washington Supreme Court in *Borst v. Borst*, 41 Wash. 2d 642, 656, 251 P.2d 149 (1952) stated:

"Parenthood places a grave responsibility upon the father and mother. It is their duty to rear and discipline the child. In rearing the child, the parents must provide a home and perform tasks around the home and on the premises. In most cases, it is necessary or convenient to provide a car for family transportation. In all the family activities, the parents and children are living and working together in close relationship, with neither the possibility of dealing with each other at arm's length, as one stranger to another, nor the desire to so deal. The duty to discipline the child carries with it the right to chastise and to prescribe a course of conduct designed for the child's development and welfare. This in turn demands that the parents be given a wide sphere of discretion.

"In order that these parental duties may adequately be performed, it is necessary that the parents be not subject to the risk of suit at the hands of their children. If such suits were common-place, or even possible, the freedom and willingness of the father and mother to provide for the needs, comforts and pleasures of the family would be seriously impaired. Public policy therefore demands that parents be given immunity from such suits while in the discharge of parental duties."

The appellant and the majority contend that public policy has changed markedly since the early decisions like *Small v. Morrison*, 185 N.C. 577. The majority states that "our task is to decide which rule best serves the needs of justice in Kansas in the

closing years of the twentieth century." *Ante* at 766. Yet, a cursory reading of the majority opinion reveals *the primary force behind the move to abolish parental immunity is the existence of liability insurance,* not a desire to serve the needs of justice. Specifically, we are reminded that *Kansas statutorily compels liability insurance for motor vehicles* (K.S.A. 1979 Supp. 40-3104). It is argued that liability insurance eliminates the threat of disrupting family harmony and subverting parental discipline. The argument is not convincing. The existence of liability insurance does not remove the inherent danger of the destruction of the parent-child relationship. See *Stevens v. Murphy,* 69 Wash. 2d at 948.

Evidence that a tort-feasor possesses liability insurance coverage is inadmissible in Kansas courts. K.S.A. 60-454. In *Alcaraz v. Welch,* 205 Kan. 163, 166, 468 P.2d 185 (1970), we stated:

"[T]he question of insurance coverage is not an issue in this case. By statute, evidence of insurance is specifically inadmissible as having probative value on an issue of negligence or liability. (K.S.A. 60-454.) Moreover, it is established law in this state that the knowing injection of liability insurance coverage by the plaintiff into a negligence lawsuit is inherently prejudicial and grounds for mistrial. (*McGuire v. McGuire,* 152 Kan. 237, 240, 103 P.2d 884; and *Coffman v. Shearer,* 140 Kan. 176, 34 P.2d 97.)"

Our well established policy on the inadmissibility of evidence of liability insurance coverage is in accord with the decisions of most states. *The fact that the particular defendant-parent is protected by insurance against legal liability does not enable the minor to maintain the action if he could not otherwise have done so.* 59 Am. Jur. 2d, Parent and Child § 156, p. 255. *The prevalence of liability insurance should not be used as a subterfuge to create a cause of action against the insured parent.*

I agree with Justice Cochran of the Virginia Supreme Court, who dissented in *Smith v. Kauffman,* 212 Va. 181, 189, 183 S.E.2d 190 (1971), stating:

"I also disagree in principle with the majority opinion. It is based on a fallacious rationalization that, since most Virginia drivers are insured against the consequences of their negligence, family harmony and family finances will not suffer from the elimination in automobile accident cases of the parental immunity doctrine heretofore applied to unemancipated minor children. This reasoning overlooks one important fact. Personal injury suits are not always settled out of court and litigation, even between members of the same family, is still an adversary proceeding.

"In a contested case between parent and child there may be either collusion on

the one hand or direct contradiction of testimony on the other. In either event by this decision we will have contributed to the deterioration of the moral fibre of our children or promoted distrust, disrespect and dissension in the home."

The majority has given birth to more than one cause of action. We have twins, or perhaps triplets. For with each suit between parent and child, we can expect numerous allegations and potential lawsuits *for either lack of cooperation or collusion.*

If the majority's arguments about liability insurance are accepted at face value, there are still going to be problems. Although liability insurance is statutorily required, there is a minimum requirement of only $15,000 bodily injury coverage. In addition, there are always uninsured motorists evading the legal requirements. Even Professor Prosser recognizes *the cost of premiums will be taken from the family's purse.* See Prosser, Law of Torts § 123 at 868 (4th ed. 1971); see also *Streenz v. Streenz,* 106 Ariz. at 92.

In a contested suit by an unemancipated child against a parent, the child's attorney as guardian *ad litem,* or in some cases where the guardian *ad litem* is not a member of the Bar, the attorney employed by the guardian *ad litem* for the child will be paid attorney fees totaling up to half of the child's recovery. Another winner will be the insurance companies—they use actuarial information to calculate premiums to make a profit, insuring carefully calculated risks. See *Streenz v. Streenz,* 106 Ariz. at 92.

Although interspousal immunity is rooted in a distinctly different common law background, it nevertheless reflects the same basic public policy as parent-child immunity. In *Sink v. Sink,* 172 Kan. 217, 219, 239 P.2d 933 (1952), we recognized the sound reasoning that interspousal litigation would disrupt family harmony. We have repeatedly affirmed that policy decision in *O'Grady v. Potts,* 193 Kan. 644, 396 P.2d 285 (1964); *Fisher v. Toler,* 194 Kan. 701, 401 P.2d 1012 (1965); and *Miles v. West,* 224 Kan. 284, 580 P.2d 876 (1978). We have not accepted the argument that liability insurance eliminates the need for interspousal immunity. We should not accept that argument now leveled against parent-child immunity.

I find indefensible the argument of the court that a happy, crippled child whose parents are worthy of affection will be unwilling to sue the negligent parent, and will have no need or thought to sue. To be intelligently informed the child will need

competent independent legal advice concerning his or her *legal rights.* Lacking this, the threat of suit hangs over the parents until some time after emancipation of the child when the statute of limitations has run. (K.S.A. 60-515.) The court notes Judge Fuld's dissent in *Badigian v. Badigian,* 9 N.Y.2d 472, 478, 215 N.Y.S.2d 35, 174 N.E.2d 718 (1961), and cites *Sorensen v. Sorensen,* 369 Mass. 350, 339 N.E.2d 907 (1975). The threat of suit will be particularly disturbing to parents in our *litigious society* in the "closing years of the twentieth century."

The unsupported statement of the court, that states which have followed the rule of law adopted today have apparently had "no significant disruption in family relationships as grimly predicted by the prophets of doom," bears analysis. The assertion challenges a review of recent activity and editorial comment on the national scene.

At the Second National Conference on the Judiciary held in Williamsburg, Virginia, March 19-22, 1978, U.S. Justice Department officials, judges, lawyers, legislators, government officials, professors and influential citizens from across the United States, and judges from common law countries, were assembled by the National Center for State Courts.

The keynote speaker, Fred W. Friendly, Edward R. Murrow, Professor of Journalism, Columbia University Graduate School of Journalism, addressed the assembly "On Judging the Judges." His opening remarks were:

"Scapegoat or 'the weakest link in our society'? Judges have some explaining to do. It is now open season on the courts." State Courts: A Blueprint for the Future, National Center for State Courts (Fetter ed. 1978).

Unveiled at the conference, and the subject of the conference discussion, was "The Public Image of Courts." The National Center for State Courts had commissioned a survey of more than 3,000 citizens, community leaders, lawyers and judges by Yankelovich, Skelly and White. The results were published at the conference. The bottom line of the whole conference was that the public image of the courts, particularly state courts, was bad.

Following the Williamsburg II conference, in the December 4, 1978, issue of *U.S. News and World Report,* the banner headline on the cover of the weekly magazine bore the words: "Why Everybody is Suing Everybody." This was the subject of a special report, beginning at page 50, by the associate editor David F. Pike. The first three paragraphs in the editorial read:

"Americans in all walks of life are being buried under an avalanche of lawsuits.

"Doctors are being sued by patients. Lawyers are being sued by clients. Teachers are being sued by students. Merchants, manufacturers and all levels of government—from Washington, D.C., down to local sewer boards—are being sued by people of all sorts.

"The 'epidemic of hair-trigger suing,' as one jurist calls it, even has infected the family. Children haul their parents into court, while husbands and wives sue each other, brothers sue brothers, and friends sue friends."

At the beginning of the editorial is a cartoon depicting a defiant child sitting at the breakfast table with his parents. The punch line is a remark by the father to the son: "If I make you drink your milk, you'll SUE me?" While *U.S. News and World Report* is not persuasive as precedent in a legal opinion, the subject of the article and its contents represent fair editorial comment under the United States constitutional protection of free speech and freedom of the press. Following the Williamsburg II Conference and the release of the poll conducted by Yankelovich, Skelly and White, it may fairly be said the editorial discloses *public disenchantment with the litigious state of affairs* "in the closing years of the twentieth century."

The November 13, 1978, issue of *U.S. News and World Report* carried an editorial entitled "Our Hungry Lawyers." This triggered a flood of letters to the editor, and in the December 4, 1978, issue of the same magazine, at page 55, a sampling of the lawyers' comments was published.

What is the reaction in Kansas to *the litigious state of affairs* "in the closing years of the twentieth century?"

The fiscal year 1981 budget of the Judicial Branch of Kansas Government was first studied in the 1980 legislative session by a Ways and Means Subcommittee of the Kansas House of Representatives. The subcommittee consisted of five members of the Ways and Means Committee, two of them being lawyers. In the subcommittee's report concerning House Bill No. 2828, sec. 5, the following is stated:

"The Subcommittee expresses concern regarding the proliferation of litigation in the judicial system and the increased costs associated with this litigation and with the appeals process. The Subcommittee suggests that the Legislature must recognize this problem as well as recognize that the alternative to reducing or minimizing this increase in litigation is to build an immense bureaucracy to accommodate the increased burden placed on the courts. The Subcommittee recommends that the Judicial Council appoint an advisory committee and that the

advisory committee be composed of attorneys, judges, and lay persons. It is suggested that the advisory committee be directed to recommend to the Supreme Court and to the Legislature alternative methods by which this increasing workload might either be reduced or more effectively administered."

The instant case is not the first bout the Kansas Supreme Court has had with the abrogation of judicially created immunities from suit. In *Carroll v. Kittle,* 203 Kan. 841, 457 P.2d 21 (1969), this court abolished the governmental immunity doctrine for torts, when the state or its governmental agencies were engaged in proprietary activities. The doctrine abrogated was of judicial origin. The legislature at its next session enacted K.S.A. 46-901 *et seq.,* (L. 1970, ch. 200, §§ 1-13) and reimposed *legislatively* the governmental immunity which the court in *Carroll v. Kittle* abolished.

Later, the doctrine of governmental immunity *legislatively declared* in K.S.A. 46-901 *et seq.,* was attacked and held to be unconstitutional and void in *Brown v. Wichita State University,* 217 Kan. 279, 540 P.2d 66 (1975) (*Brown I*), by a divided court; but on rehearing the court reversed that decision in *Brown v. Wichita State University,* 219 Kan. 2, 547 P.2d 1015 (1976) (*Brown II*). In the period between *Brown I,* handed down by the court on June 9, 1975, and the court's reversal of its decision in *Brown II* on March 6, 1976, total damages of many millions of dollars were sought by various plaintiffs who filed lawsuits against the state as a result of the abrogation of immunity in *Brown I.*

The primary function of the law as applied through the court system is to provide a means for peaceful resolution of legal disputes. In my opinion, the court by its decision herein has gone over dead center, created legal rights where none heretofore existed, and has put in motion a device to crack *the fundamental unit in our free civilized society—the family unit;* just as scientists have created the mechanism by which to crack the fundamental unit of all matter in nature—the atom—thereby making it possible to unleash in the atom bomb a horrendous instrument of destruction for mankind.

It is respectfully submitted the judgment of the learned trial judge should be affirmed.

McFarland, J., dissenting: The majority opinion adopts the rule that henceforth a child may sue its parent for injuries re-

ceived through the parent's operation of a motor vehicle, and thereby creates a new cause of action. Major public policy considerations are inherent therein, including:

1. Is there a need for such a cause of action?

2. If the need exists, should it be limited to situations where insurance is present? (Within this question is the legal determination of whether this is a legitimate basis of limitation.)

3. What has been the experience of other states abolishing parental immunity, either in whole or in part?

4. Will insurance rates rise for parents of minor children and, if so, will such rise be in direct proportion to the number of minor children in the family?

5. If the increased risk is to be spread across all automobile insurance policies, regardless of whether or not the owner of the vehicle has minor children, then how much raise will be involved?

6. How great is the danger of collusion?

7. What will be the effect on family unity?

8. On balance, do the benefits of the change outweigh its cost, both financially and socially?

These questions can only be answered by full legislative inquiry. If a change is to be made in the existing law, the change should come through the legislature—not the courts.

If the existing law is to be judicially changed, then I would:

1. Exclude ordinary negligence as a cause of action except when arising out of the parent's business; and

2. Limit the cause of action to intentional torts and acts of gross or wanton negligence.