No. 82-187

IN THE SUPREME COURT OF THE STATE OF MONTANA

1983

---

TRANSAMERICA INSURANCE CO.,
a foreign corporation,

Plaintiff and Appellant,

vs.

WILLIAM D. ROYLE, as Conservator of
Mary Kay Haines, a Protected Person;
BYRON D. HAINES and JOYCE WILSON HAINES,

Defendants and Respondents.

---

ORIGINAL PROCEEDING:

Counsel of Record:

For Appellant:

Keefer, Roybal, Hanson, Stacey & Jarussi, Billings,
Montana
Gene Jarussi argued, Billings, Montana

For Respondents:

Christian, McCurdy & Wold, Polson, Montana
Douglas Wold argued and Jean Turnage argued, Polson,
Montana

For Amicus Curiae:

Tim D. Hall argued, Billings, Montana

---

Submitted: November 12, 1982

Decided: January 12, 1983

Filed: JAN 12 1983

*Ethel M. Harrison*

Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

This case comes from the Federal District Court by way of certification pursuant to Rule 1 of the rules of this Court. At issue is an insurance company's obligation to defend or provide coverage for parents who are being sued by their daughter.

Judge Russell Smith has certified the following two issues:

1. "Is the 'household exclusion' in a policy [of auto insurance], not certified under the Motor Vehicle Safety Responsibility Act, valid?"

2. "Is a parent immune from action in tort brought against him by his children under the age of emancipation?"

On November 14, 1980, Mary Kay Haines was injured in an auto accident. She was a passenger in a car in which her mother was driving. As a result of her injuries, Mary Kay is now a quadriplegic. The car was owned by Mary Kay's father, Reverend Byron Haines, and was insured by Transamerica Insurance Company. The insurance policy contained a "household exclusion clause" which excludes coverage for "bodily injury to any person who is related by blood, marriage, or adoption to [the insured], if that person resides in [the insured's] household at the time of loss."

Mr. Royle, as conservator for Mary Kay, filed an action against the Haines in State Court in Lake County to recover damages. The Haines demanded that Transamerica assume their defense and provide coverage. Transamerica refused and filed an action in Federal District Court claiming it had no obligation under the insurance contract. The parents then sought a declaratory judgment in state court asking that the "household exclusion clause" be declared invalid. That action was removed to Federal Court and consolidated with the Transamerica action. On May 6, 1982, Judge Russell Smith certified the two issues to this Court.

In plaintiff's view the first issue boils down to whether or not section 61-6-301(1), MCA, prohibits a family exclusion clause in an automobile insurance policy. In pertinent part, the above

cited section reads: "Every owner of a motor vehicle . . . shall continuously provide insurance against loss resulting from liability imposed by law for bodily injury or death or damage to property suffered by any person . . ." (Emphasis added.)

Plaintiff argues simply that the statute does not void the family exclusion clause because the statute only requires coverage for "liability imposed by law." In other words, if Montana recognizes parental immunity from suit by their children then Mr. and Mrs. Haines cannot be liable; and since there would not be "liability imposed by law" the family exclusion clause would be valid. Although not stated by plaintiff, it follows from their view that the first question to be decided by this Court is the parent-child immunity question. We agree. Our decision on issue number two will control our decision on issue number one. In other words, if we recognize parental immunity, then the exclusion clause is valid; and vice versa, if parent-child immunity does not exist, then the exclusion clause must be invalid by virtue of section 61-6-301(1), MCA. As is discussed later, we find that a child may maintain an action against his parent for negligence arising out of the operation of a motor vehicle. Thus, the exclusion clause is invalid. Before reaching the immunity question, we must dispel confusion concerning issue number one.

Prior to 1979, Montana law required only certain persons to demonstrate and maintain financial security. That law, which is still on the books, is called the Motor Vehicle Safety Responsibility Act. (Sections 61-6-101, et seq.) Only those who had their driver's license revoked due to a conviction or forfeiture of bail of certain motor vehicle laws were required to demonstrate financial security, i.e., obtain a liability insurance policy. See sections 61-6-131(1) and 61-6-132(1)(a), MCA. Thus, only "bad drivers" were required to carry liability insurance, and liability of the insurer under those policies was "absolute." Section 61-6-103(6)(a), MCA. In other words, such a

policy could not contain exclusions. The insurance company would then certify that it had insured the "bad driver," section 61-6-133, MCA. Only then could the bad driver regain driving privileges.

This Court, in interpreting the Safety Responsibility Act held that ordinary policies, or those policies not required under the Act, could contain exclusions. Boldt v. State Farm Mutual (1968), 151 Mont. 337, 443 P.2d 33; Northern Assurance Company v. Truck Insurance Exchange (1968), 151 Mont. 132, 439 P.2d 760. Specifically, ordinary policies could contain a family exclusion clause, Mid Century Insurance Co. v. American Casualty Company (1968), 152 Mont. 328, 449 P.2d 679.

In summary, policies to be certified under the Act could not contain exclusions; whereas, policies not to be certified under the Act (policies of good drivers) could contain exclusions.

However, in 1979 the legislature mandated liability insurance. Every vehicle owner is now required to certify to the county treasurer that he possesses an automobile liability insurance policy. It appears from the briefs that "in the instant case, the subject insurance Policy was 'certified' by the owner of the vehicle [the Haines] as proof of having complied with the law requiring insurance for bodily injury suffered by 'any person.'" Thus, the policy was certified under the law requiring mandatory liability insurance but was not certified under the Motor Vehicle Safety Responsibility Act. Had the policy been certified under the Safety Responsibility Act, Boldt and Northern Assurance would control and the result would be that the exclusion is invalid.

When Judge Smith framed the issue, he was only saying that this case does not involve a certification under Part 1 of Title 61, Chapter 6, MCA; the Safety Responsibility Act. Instead, this case arises under Part 3 of the same title and chapter, the law requiring mandatory liability protection. The two parts are independent.

- 4 -

Section 61-6-136, MCA, precludes any relationship between the two parts. That section states in part: "[t]his part shall not be held to apply to or affect policies of automobile insurance against liability which may now or hereafter be required by any other law of this state . . ." Other authority exists to show that part 1 and part 3 are independent. See State Farm v. Queen (1981), _____ F.Supp. _____, 38 St.Rep. 608. See 7 Am.Jur.2d Automobile Insurance, Section 20 (1980).

In conclusion, part 1 of title 61 chapter 6 and the cases of Boldt and Northern Assurance are not controlling to the first issue. More specifically, the statutory restrictions on insurance policies contained in section 61-6-103 do not apply to policies purchased to fulfill the requirements of Part 3, Mandatory Liability Protection.

The effect of the langauge of the Mandatory Insurance Law requires the liability policy to protect against bodily injury and property damage to "any person." In so providing, the legislature has expressly outlawed the "household exclusion."

In considering the principle issue presented; whether or not a child can sue her parent, we have reviewed the vast amount of writings done on the subject by courts, writers and others and find that further discussion would serve no useful purpose. The issue is one of first impression in this jurisdiction and we do not believe our case should be determined by the number of authorities which support one rule or the other, anymore than that a jury should resolve issues according to the number of witnesses who appear on one side or the other.

A comprehensive annotation giving the historic background of the doctrine is available under the title "Liability of Parent for Injury to Unemancipated Child Caused by Parent's Negligence - Modern Cases" in 6 A.L.R.4th 1066. The cases cited agree that the doctrine is a creature of American jurisprudence. Prosser, Law of Torts, Sect. 122 (4th Ed. 1971) suggests that there is no reason to think that the English law would not permit actions for

personal torts as well as disputes involving property rights be-
tween child and parent. He notes that there are decisions in
Canada and Scotland permitting such actions. Reading both
Prosser, and Harper and James, Law of Torts, Vol. 1, Sect. 8.11
(1956), the concurrence is that the doctrine has no foundation in
English law.

The doctrine of parental immunity is a judicially created
doctrine arising out of a case from the State of Mississippi,
Hewellette v. George (1891), 68 Miss. 703, 9 So. 885. The case
cites no case authority for its holding yet within a few short
years, other jurisdictions adopted it without questioning its
ancestry. Long after the doctrine became legitimized thinking,
courts and scholars began to criticize the doctrine due to the
injustices created in many factual situations. See, Prosser,
Sect. 122 at 864; 1 Harper & James, Law of Torts, Sect. 8.11 at
650; Nocktonick v. Nocktonick (1980), 227 Kan. 758 , 611 P.2d
135. As noted in the Nocktonick case, supra, these criticisms
resulted in a number of judicial decisions which have eroded the
doctrine by creating numerous exceptions. As a result, there are
few jurisdictions, if any, recognizing parental immunity in its
original form.

Some eight exceptions to the doctrine have evolved these
past few years. Nocktonick, 611 P.2d at 138. It is to the
eighth exception, allowing a child to sue his parents for
injuries caused by the negligent operation of a motor vehicle
that we direct our consideration.

The principle reason relied on by the courts for allowing an
action by a child against their parent in an automobile accident
case is the prevalence of automobile liability insurance. "While
courts concede the existence of automobile insurance cannot
create a liability where none before existed, the prevalence of
liability insurance has been held to be a proper factor to con-
sider in determining the applicability of the parental immunity."
Nocktonick, 611 P.2d at 138-39. The courts which have recognized

this exception have reasoned that the policy reasons which origi-
nally supported parental immunity no longer are applicable. The
existence of liability insurance prevents family discord and
depletion of family assets in automobile negligence cases;
contrary to the original policies. Sorenson v. Sorenson (1975),
369 Mass. 350, 339 N.E.2d 907; and Goller v. White (1963), 20
Wisc.2d 402, 122 N.W.2d 193.

Probably the most persuasive argument against abrogation of
parent-child immunity is the possibility of fraud and collusion.
Unscrupulous families may attempt to recover unjustified awards
from insurance companies. While we recognize this possibility,
we do not believe it justifies denial of meritorious claims. We
agree with the Supreme Court of Kansas which said:

> "[t]he possibility of collusion exists to a
> certain extent in any case. Every day we
> depend on juries and trial judges to sift evi-
> dence in order to determine the facts and
> arrive at proper verdicts. Experience has
> shown that the courts are quite adequate for
> this task. In litigation between parent and
> child, judges and juries would naturally be
> mindful of the relationship and would be even
> more on the alert for improper conduct." 611
> P.2d at 142.

We have been asked to decide which rule best serves the needs
of justice in this state. In setting Montana's rule, we must
recognize that the more recent decisions rejecting parental immu-
nity are indicative of a "growing judicial distaste for a rule of
law which in one sweep disqualified an entire class of injured
minors." Gibson v. Gibson (1971), 3 Cal.3d 914, 479 P.2d 648,
650. We believe that the authorities which favor abrogation of
the parental immunity doctrine state the proper approach in light
of modern conditions and conception of what is good public
policy. We see no reason why children should not enjoy the same
right or protection and the same legal redress for wrongs done
them as others enjoy. Due to the fact that this is a case of
first impression in Montana and the fact that we are not encum-
bered by previous decisions, our task is made easier than other
states who have had to qualify the rule in search of justice.

The principle that an unemancipated minor may not sue a parent in tort is a "man-made rule," and it is the duty of the judiciary in examining it to make such rule as justice requires when the legislature has not chosen to act.

Our holding is limited to the issues certified to us by the Federal Court; "is a parent immune from action in tort brought against him by his children under the age of emancipation?" While the issue certified to us by the federal court asks "is a parent . . . in tort . . .;" our holding is limited to actions brought against a parent by a child under the age of emancipation injured in the operation of a motor vehicle. To allow such an action does not undermine parental authority and discipline, nor does it threaten to substitute judicial discretion for parental discretion in the care and rearing of minor children. We must recognize that there may be parental exercises of discretion and authority which would deserve special protection in a court of law. Here, we merely remove any barrier to the enforcement of liability in an automobile accident case brought by an unemancipated minor against a parent. When confronted with other cases involving claimed parental immunity, we will at that time determine to what extent the doctrine or privilege should be recognized.

In addition, we hold that the household exclusion clause is invalid due to its failure to "honor the reasonable expectations" of the purchaser of the policy. See Keeton, Insurance Rights at Variance with Policy Provisions, 83 Harvard Law Rev. 961, 967 (1970). Professor Keeton sets forth this principle as follows:

> "The objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations."

This policy is an adhesion contract that justifies this Courts consideration of the consumer approach.

We hold that a parent is not immune from suit brought by his child under the age of emancipation in cases involving parental

negligence in the operation of a motor vehicle. Consequently, we must hold that a family exclusion clause is void and unenforceable because section 61-6-301(1), MCA, requires motorists to carry insurance against loss resulting from liability imposed by law for injury suffered by any person.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices

_____
Honorable Leonard H. Langen,
District Judge, sitting in
place of Mr. Justice Frank B.
Morrison, Jr.

Mr. Justice Daniel J. Shea specially concurring.

I join the majority on the issue of the "household exclusion" in the insurance policy. I would go another step, however, on the question of parental immunity and simply declare that this Court does not recognize the doctrine and if it is to be recognized, it is a question for the legislature, not for the courts.

The majority confines the abolition of parental immunity to "actions brought against a parent by a child under the age of emancipation injured in the operation of a motor vehicle." But, as long as this Court has now refused to recognize this doctrine, we should not decide that possibly we may recognize it in another context than that which has been presented here. If parental immunity is to be recognized completely, or in any limited form, it seems to me that the legislature is the proper place to determine the circumstances in which it should or should not be so recognized. These are public policy questions better left to the legislature; we are ill-equipped to undertake that task.

_____
Justice